**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Walter L. BALLARD, James R. Clark, Ronald B. Pruitt and John L. Burns, Defendants-Appellants.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Walter BALLARD, Defendant-Appellant.**

**Nos. 79–5268, 80–5752.**

United States Court of Appeals, Fifth Circuit.*
Unit B

July 12, 1982.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452 October 14, 1980.

Bruce S. Rogow, Nova University Law Center, Fort Lauderdale, Fla., for Ballard.

Ellis C. McCullough, Houston, Tex., for Clark.

Olney G. Wallis, Houston, Tex., for Pruitt and Burns.

G. Ernest Caldwell, Houston, Tex., for Burns.

Judy S. Rice, W. Christian Hoyer, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

## ON PETITION FOR REHEARING

Before MARKEY **, Chief Judge, and HILL and HENDERSON, Circuit Judges.

PER CURIAM:

The United States has filed a petition for rehearing asserting that we misunderstood certain facts which were crucial to our disposition of this case. We deny the petition, but we modify our opinion (reported at 5th Cir., 663 F.2d 534) as explained below in order to clarify the grounds upon which we reversed the appellants' convictions.

The appellants [1] were convicted on charges of conspiracy and mail fraud in violation of 18 U.S.C. §§ 371 and 1341. The charges were based on their involvement in a scheme in which corporate employers were allegedly defrauded when their employees failed to disclose the existence of a manipulative system of reselling oil (a "daisy-chain") and the participation of the employees in the system of payoffs that resulted from the daisy-chain.[2] We held that a breach of fiduciary duty of honesty or loyalty involving a violation of the duty to disclose could only result in a criminal mail fraud where the information withheld from the employer was material and that, where the employer was in the private sector, information should be deemed material if the employee had reason to believe the information would lead a reasonable employer to change its business conduct. 663 F.2d at 540–41. We found that Ballard and Burns could not have failed to disclose material information to their employers even if they had withheld their knowledge of the daisy-chaining scheme since the companies

---

** Honorable Howard T. Markey, Chief Judge for the U. S. Court of Customs and Patent Appeals, sitting by designation.

1. The appellants referred to herein are Walter L. Ballard, James R. Clark, Ronald B. Pruitt, and John L. Burns. The other appellant whose claims were considered in our opinion was Raymond F. Granlund, who died on November 15, 1981. His death was certified to us after the opinion had issued, and we then ordered that his appeal be dismissed as moot and that the district court vacate the judgment and dismiss the indictment against him.

2. The daisy-chaining scheme is described at 663 F.2d 536–39.

could not have used the information to alter their conduct. Pruitt and Clark, in turn, could not have been guilty of aiding and abetting. Underlying these conclusions was our understanding that the evidence showed that the regulatory scheme effected through the Federal Emergency Petroleum Act ("the Act") would have prevented Charter and Signal—the oil companies for which Ballard and Burns worked—from obtaining a higher market price for their oil.[3]

In its petition for rehearing, the government argues that Charter and Signal suffered actual monetary loss as a result of the appellants' alleged misconduct. The government contends that we overlooked the detriment suffered by Charter and Signal because we did not understand (1) that the appellants' scheme was in operation before the regulatory scheme imposed by the Act became effective or (2) that the evidence was inconclusive that Charter and Signal received their maximum price for oil under the regulatory scheme.

After reviewing the record and the original briefs submitted on appeal, we conclude that these arguments are being presented for the first time in the petition for rehearing. The government, from the beginning

of the trial to its end, pursued the broad theory that the mail fraud statute is violated whenever the mail is used to further a scheme in which an employee accepts unauthorized compensation. The trial court instructed the jury that a deliberate breach of fiduciary duty constitutes a "scheme to defraud" under the mail fraud statute and that an employee's fiduciary obligation includes "a duty to make a full and fair disclosure to the employer of any personal interest or profit which the employee expects to derive or has derived from any transaction in which he participates in the course of his employment." Transcript vol. XXI at 224–25. In arguments to the jury the government emphasized that any acceptance of unauthorized compensation would constitute fraud under these instructions.[4] E.g., id., vol. XX at 54; id., vol. XXI at 182–85. There was no attempt to show at trial the type of detriment which we have held is necessary for a breach of fiduciary duty to work a criminal fraud. For that reason, the argument that actual detriment existed is not sufficiently supported by the evidence adduced at trial.[5]

First, the record does not establish that the scheme alleged by the government

---

**3.** We have retained use of the Act as a time reference for allocation and specific pricing regulations for petroleum products herein in order to be consistent with our opinion. However, that is somewhat misleading; according to a letter this court received from the Department of Energy:

> [p]rice controls were promulgated even prior to enactment of the Emergency Petroleum Allocation Act ... under the authority of the Economic Stabilization Act of 1970 ("ESA"). In this regard, the ESA vested in the Cost of Living Council (CLC) the authority to regulate the prices at which petroleum products were sold. Pursuant to an Executive Order, on June 13, 1973 the CLC implemented a "freeze" on, among other things, the selling prices of petroleum products as part of Phase III of its wage and price stabilization program. Although those regulations did not require the calculation of maximum lawful prices, they "froze" the actual selling prices in effect during the summer of 1973. On August 19, 1973 the CLC promulgated, as part of Phase IV, specific pricing regulations governing the sale of petroleum and petroleum products. 6 C.F.R. Part 150, Subpart L (38 Fed.Reg. 22536, August 22, 1973.) Those

controls were adopted and continued by the Federal Energy Office on December 27, 1973. 10 C.F.R. Part 212 (39 Fed.Reg. 744, January 2, 1974). These regulations generally required sellers to determine maximum lawful prices.

**4.** The government had sought a similar instruction which would also have obviated the need to show a detriment to the employer. Transcript, vol. XIX at 245–46.

**5.** We recognized in our opinion that, in the absence of price regulations, payments such as those received by the appellants could be captured in the form of higher prices by the corporations at the beginning of the daisy-chain. See 663 F.2d at 541. Thus, in an unregulated market, the detriment necessary for a finding of mail fraud in a case such as this would be shown by mere receipt of kickbacks. Part of the appellants' defense in this case was, however, that price and allocation regulations precluded the corporations from capturing those profits. It was thus necessary for the government to prove otherwise in order to establish guilt beyond a reasonable doubt.

antedated both the Act and the regulations pursuant to the Act. The trial judge was never asked to take judicial notice of the time the Act and regulations became effective, nor did the government bring the correct date of price controls to the attention of the jury. During most of the trial the testimony simply refers to the government controls as being in effect at the time of the daisy-chaining transactions. Where specific times are indicated, they tend to support the idea that all the transactions took place after the price controls were in effect. For example, one government witness testified on cross-examination: "I believe there was some type of pricing regulations in effect during '73. I do not know whether it was Phase 1, Phase 2, Phase 4, or the existing regulations that occurred after the Arab embargo." Transcript, vol. X, Testimony of Dudley K. Parker at 73. Another government witness testified on cross-examination that "price ceilings started back on March 15, along with the allocation program." *Id.*, vol. IX, Testimony of O. J. Tauber at 208. Since the government contends that the appellants' scheme began in April of 1973, such testimony indicates that no oil transactions occurred before price controls went into effect.

The government's second contention—that the convictions can be upheld because maximum profits were not being received by Signal or Charter—must also be rejected. The government cites testimony indicating that Charter and Signal were not able to determine, after price controls went into effect, whether they had received the best prices for their products on each transaction on which the appellants were receiving profits. Standing alone, though, such testimony does not permit the conclusion that each corporate employer did not receive its maximum profit. Moreover, the government conceded in its brief on appeal that the selling corporations were receiving maximum prices. The government's own brief described the appellants' scheme as follows:

> In order to increase the amount of profits gained by the selling corporations (and thus increase the amount of his own commissions), Granlund arranged for the oil to be "daisy-chained" from one selling corporation to another before it reached FPC. Each seller *charged its legal limit* by adding its profit margin to its purchase price, the price became increasingly higher and the defendants split the profits and commissions paid to Granlund.

Brief for Appellee at 13–14 (emphasis added).

It will not do that on motion for rehearing the government for the first time questions its own prior concessions and shores up its own trial strategy by arguing here that the corporate employers suffered an actual loss of profits because there might have been a short period of time at the commencement of the activities of the appellants when price controls and allocation programs had not come into effect or because the corporate employers were not receiving maximum profits on the transactions in question during the regulatory scheme. Clearly, from the record, the prosecution did not undertake to urge or prove at trial the theories offered here. It cannot be concluded, from what was offered in evidence by the government, that the jury could have found beyond a reasonable doubt that the appellants had deprived corporate employers of their employees' faithful services in a manner that would have constituted mail fraud under § 1341. The conduct as proven did not, as explained in our opinion, constitute the crime charged, and the convictions cannot stand on the state of this record. Under the unusual circumstances of this case, fraud resulting from the alleged breaches of fiduciary duty was not demonstrated; absent such proof, the government's evidence set forth only what some would characterize as distasteful business manipulations and transactions which ought not be acceptable in commerce.

We modify our opinion to clarify that the convictions were based (impermissibly) on mail fraud and that no regulatory violation was submitted to the jury as a theory for prosecution. We make no judgment as to the regulatory proscriptions regarding daisy-chaining under the Act or any other

price or allocation controls which were promulgated by Congress or the Department of Energy.[6] Accordingly, we eliminate that paragraph of our opinion at 663 F.2d 544 which begins with the sentence: "Our disposition of these cases is in no way a condonation of the appellants' behavior." At 663 F.2d 536, we modify our language to read: "In the complex laws and regulations then controlling the marketing of oil, none [was shown at trial to have] prohibited this practice."

With these observations and modifications, the Petition for Rehearing is DENIED.

---

6. The Department of Energy contends that its regulations did prohibit daisy-chaining, contrary to dicta in our opinion. Whether that is true is unnecessary to our resolution of this case since no regulatory violations were alleged and since the government did not contend at trial that the corporate employers suffered actual detriment because their employees subjected the companies to potential liability for illegal profits and civil penalties under the regulatory scheme.