**UNITED STATES of America**

v.

**Barney Dewey RATCLIFF, Jr.**

**No. CRIM.A.04–172–D–M3.**

United States District Court,
M.D. Louisiana.

May 23, 2005.

Lewis O. Unglesby, Samuel Charles Ward, Jr., Unglesby & Marionneaux, LLC, John S. Baker, Jr., Baton Rouge, LA, for Barney Dewey Ratcliff, Jr.

Corey Ross Amundson, United States Attorney's Office Middle District of Louisi-ana, Baton Rouge, LA, for United States of America.

## RULING ON MOTION TO DISMISS AND MOTION TO STRIKE

BRADY, District Judge.

This matter is before the court on a motion to dismiss (doc. 22) and a motion to strike (doc. 23) filed by Barney Dewey Ratcliff, Jr. ("defendant"). The government filed an opposition to the motion to dismiss (doc. 32) and an opposition to defendant's motion to strike (doc. 30). The defendant then filed a reply memorandum (doc. 33) in support of his motion to dismiss. Oral argument was held on April 25, 2005 and the government subsequently filed a supplemental brief (doc. 35) and the defendant responded with his own supplemental brief (doc. 36).

### I. Facts

The defendant in this case is charged with fourteen counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. He is also charged with one count of making a false statement to a financial institution in violation of 18 U.S.C. §§ 1014 and 2. The defendant's motion to dismiss is limited to the mail fraud alleged in counts one through fourteen of the indictment.

In order to fully understand the charges levied against the defendant, a summary of the facts surrounding this case is necessary. Pending before the court is a motion to dismiss the indictment for, among other things, failure to state an offense; therefore, the court is required to take the allegations of the indictment, as set forth below, as true.[1]

Pursuant to Article VI, Section 5 of the Louisiana Constitution of 1974, Livingston

---

1. *E.g. United States v. Kay,* 359 F.3d 738, 742 (5th Cir.2004); *United States v. Crow,* 164 F.3d 229, 234 (5th Cir.1999).

Parish operates under a Home Rule Charter. According to its Home Rule Charter, the citizens of Livingston Parish elect a Parish President to a four year term.[2] In 1999, the defendant was the incumbent Livingston Parish President and a candidate for re-election. Candidates for public office in the State of Louisiana must abide by the provisions of Louisiana's Campaign Finance Disclosure Act ("the Act").[3] The Act prohibits any candidate for parishwide elective office[4] from receiving contributions, loans, or loan guarantees in excess of $2500.00 from any individual.[5] The Livingston Parish President is elected parishwide and, therefore, is governed by the $2500.00 limitation. The Act also requires candidates to file campaign finance disclosure reports with the Louisiana Board of Ethics at the Board's office in Baton Rouge.[6] Campaign finance disclosure reports are to include all campaign contributions, loans, guarantors thereof, and expenditures.[7]

On September 23, 1999, the defendant obtained a $50,000.00 loan from the Bank of Zachary ("the Bank") for the purpose of financing his re-election campaign. The defendant had insufficient income to qualify for the loan; therefore, a local businessman with sufficient assets co-signed for the loan.

One week later, on October 7, 1999, the defendant obtained a second $50,000.00 loan from the Bank and the same businessman co-signed for this loan. The co-signor also assigned a $50,000.00 certificate of deposit as collateral for the loan. Shortly thereafter, the defendant filed a campaign finance disclosure report with the Board of Ethics in which he reported contributions that he received from September 14, 1999 to October 3, 1999. In the report, the defendant disclosed the September 23, 1999 loan and the co-signor's guarantee thereof. The Board of Ethics then advised the defendant that the guarantee for the September 23rd loan was possibly in violation of the Act. In response, the defendant informed the Board of Ethics that he had instructed the Bank to prepare new loan documents for his signature alone.

On October 22, 1999, the defendant obtained two new loans from the Bank to pay off the loans which had been improperly guaranteed by the businessman. The indictment charges that the October 22nd loans were secured with a pledge of $99,000.00 in cash. It is further alleged that the cash was supplied by one of the defendant's supporters. Additionally, the government contends the defendant knew that his receipt of the cash was in violation of the $2500.00 individual loan limitation and, therefore, did not report his receipt of the cash to the Board of Ethics.

On November 1, 1999, one of the defendant's opponents filed a complaint with the Board of Ethics regarding the businessman's guarantee of the September 23rd loan. Consequently, the Board of Ethics opened an investigation into the matter, which lasted until July 2001.

On November 3, 1999, the defendant obtained another loan in the amount of $50,000.00 from the Bank. This loan was

---

2. Livingston Parish, La., Home Rule Charter, art. III, § 3–02.

3. La. R.S. 18:1495.1–1495.6 (West 2004).

4. Within the Campaign Finance Disclosure Act, the term "district office" includes "[a]ll public offices elected parishwide." La. R.S. 18:1483(7)(b).

5. La. R.S. 18:1505.2(H)(1)(a)(ii).

6. La. R.S. 18:1484(1), 1485(A).

7. La. R.S. 18:1495.5.

secured by a pledge of $55,000.00 in cash supplied by one of the defendant's supporters. Again, the government claims that because the defendant knew that receiving this cash was in violation of the $2500.00 limitation, he did not report his receipt of the cash on his disclosure reports. During the course of the campaign, the defendant contracted with a political consultant and by November 18, 1999, the defendant owed the consultant over $57,000.00. On November 20, 1999, the defendant was re-elected as Parish President.

Two days later, a lobbyist allegedly provided the defendant with $44,100.00 in cash for the defendant's political consultant to hold as collateral until the defendant paid the consultant for his outstanding bill. The government again claims that the defendant's use of the cash to secure a campaign debt was in violation of the $2500.00 limitation and the defendant did not report the loan on his campaign finance disclosure reports.

In addition to the defendant's alleged failure to report the amount of cash or loans that he received, he allegedly misled the Board of Ethics during its investigation of the Bank loans. Specifically, the government contends the defendant falsely represented that he had the credit worthi-ness to obtain the September 23rd and October 7th loan without any co-maker or surety. The government further contends that the defendant misled the Board of Ethics by representing that the October 22nd loans were obtained on the basis of his independent creditworthiness.

Finally, the government argues that the object of the scheme was to deprive Livingston Parish of the salary and benefits payable to the Parish President. After the defendant's successful campaign, he served as Parish President from January 10, 2000 to January 12, 2004. During his tenure, the defendant received over $300,000.00 in salary and employment benefits from Livingston Parish.

The defendant has been charged with fourteen counts of mail fraud under 18 U.S.C. § 1341.[8] The object of the alleged scheme to defraud for each count is the defendant's salary and benefits. Counts one through three pertain to material that either the defendant himself or his attorney mailed to the Board of Ethics and the Bank.[9] Counts four through fourteen are based on checks paid by Livingston Parish to Gulf South Health Plan, Blue Cross, Parochial Retirement, and American Unit-

---

**8.** 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**9.** Indictment ¶ 20(a)(b) (doc. 1).

ed Life Insurance.[10] The checks relevant to counts four through fourteen were issued to pay for health insurance, life insurance, and retirement contributions for the defendant.[11]

In his motion to dismiss, the defendant has raised several arguments which challenge the § 1341 mail fraud charges in counts one through fourteen. Specifically, the defendant argues that: (1) the indictment does not set forth a scheme to defraud involving money or property; (2) even if the factual allegations are proved, the government cannot prove the legal element of specific intent as required under § 1341; and (3) the mail fraud statute "as applied" in this indictment violates the Commerce Clause.

## II. Motion to Dismiss Standard

As the Fifth Circuit has explained, "[a]n indictment is sufficient if it contains the elements of the charged offense, fairly informs the defendant of the charges against him, and insures that there is no risk of future prosecutions for the same offense." [12] In addition, the appropriateness of granting a motion to dismiss an indictment under Fed.R.Crim.P. 12 by pretrial motion is largely contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact.[13] When, as here, the defendant has challenged the indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated.[14]

## III. Discussion

### A. First, the defendant contends that the indictment fails to set forth a scheme to defraud involving money or property as required by § 1341.

■ To state an offense under the mail fraud statute, the indictment must allege: (1) the defendant devised or intended to devise a scheme to defraud another of money or property;[15] (2) the defendant caused something to be mailed for the purpose of carrying out the scheme;[16] and (3) the scheme employed false material representations.[17]

■ The defendant argues that *Cleveland v. United States* [18] requires the dis-

---

**10.** Indictment ¶ 20(c)-(f) (doc. 1).

**11.** *Id.*

**12.** *United States v. Cavalier,* 17 F.3d 90, 92 (5th Cir.1994) (citing *United States v. Arlen,* 947 F.2d 139, 144 (5th Cir.1991)).

**13.** *United States v. Miller,* 491 F.2d 638, 647 (5th Cir.1974).

**14.** *Kay,* 359 F.3d at 742.

**15.** A scheme to defraud another of "honest services" need not be alleged in this indictment inasmuch the government has not invoked 18 U.S.C. § 1346. Hence, in counts one through fourteen the defendant is only charged with defrauding another of money or property under § 1341.

**16.** *See United States v. Caldwell,* 302 F.3d 399, 409 (5th Cir.2002).

**17.** As to the material representation requirement, the government suggests that *Caldwell* indicates that materiality need not be alleged in the indictment. Nevertheless, for the purposes of this ruling, the government assumes that the materiality element must be alleged. This court's interpretation of *Caldwell* is that it does not remove the materiality requirement; rather, it merely stands for the proposition that if the facts alleged in the indictment warrant an inference of materiality, the indictment is not fatally flawed. *Caldwell,* 302 F.3d at 409.

**18.** 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000).

missal of each of the mail fraud counts. The issue presented in *Cleveland* was whether the federal mail fraud statute, 18 U.S.C. § 1341, reached false statements made in an application for a state license. Before trial, the defendant in *Cleveland* moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the State of "property" under § 1341.[19]

The District Court denied the motion because it concluded that licenses constitute property even before they are issued.[20] The Fifth Circuit then affirmed the district court's ruling.[21] The United States Supreme Court reversed the lower courts and held that the State of Louisiana did not depart with "property" within the meaning of the mail fraud statute when it issued a license to operate video poker machines.[22]

In the instant matter, the defendant argues that ethics reports from candidates for elective office concern good government; but like the granting of a license in *Cleveland,* they do not constitute property for purposes of § 1341.[23] The government argues *Cleveland* is inapplicable because the indictment alleges the defendant received salary and employment benefits as the object of the scheme.

Thus, the government relies on the "salary theory" for the proposition that *Cleveland* does not mandate the dismissal of the mail fraud counts. Additionally, the government contends the recent holding in *Pasquantino v. United States*[24] further demonstrates the limitation of the *Cleveland* decision. In *Pasquantino*, the Supreme Court held that Canada's right to collect excise taxes on imported liquor was property within the meaning of the wire fraud statute, 18 U.S.C. § 1343.[25] Although *Cleveland* interpreted the term 'property' within the mail fraud statute, 18 U.S.C. § 1341, the Supreme Court has construed identical language in the wire and mail fraud statutes *in pari materia.*[26]

In the instant case, the government states the *Pasquantino* Court recognized that in *Cleveland* they had held that a "State's interest in an unissued video poker license was not 'property,' because the interest in choosing particular licensees was 'purely regulatory' and '[could not] be economic.'"[27] The *Pasquantino* Court further noted that in *Cleveland* there was no suggestion that the defendant aimed at depriving the State of any money due under the license.[28] Conversely, in *Pasquantino*, the government alleged the petitioners' scheme was aimed at depriving Canada of money to which it was entitled by law.[29] Accordingly, the Court held that Canada could hardly have a more serious economic interest than in the receipt of tax revenue and, therefore, *Cleveland* was different from the *Pasquantino* case.[30] Similarly, the government argues the case

19. *Id.* at 17, 121 S.Ct. 365.

20. *Id.*

21. *Id.* at 18, 121 S.Ct. 365.

22. *Id.* at 26–27, 121 S.Ct. 365.

23. Def.'s Mot. Dismiss p. 4 (doc. 23).

24. — U.S. —, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005).

25. *Id.* at 1771.

26. *Id.* at 1771 n. 2 (citing *Neder v. United States,* 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

27. *Id.* at 1771–72 (citing *Cleveland,* 531 U.S. at 22–23, 121 S.Ct. 365).

28. *Id.* at 1771–72.

29. *Id.*

30. *Id.*

at bar is distinguishable from *Cleveland* in that the indictment in the instant case alleges the object of the scheme was the salary and benefits paid by Livingston Parish.

Although each party presents compelling arguments on this issue, the court does not adopt either argument in its entirety. The defendant's argument is misplaced in that the government is claiming the salary and benefits were the object of the scheme to defraud, not the ethics reports filed with the Board of Ethics. Nonetheless, the court agrees with the defendant insofar as the *Cleveland* decision restricts the application of § 1341 in certain instances.

As for the government's argument, *Cleveland* appears distinguishable from the case at hand because the government has alleged the salary and benefits received by the defendant constitute money or property as required by § 1341. However, the cases cited by the government in support of the salary theory have questionable applicability in the Fifth Circuit. More importantly, several of the government's cited cases, as more fully examined below, may have employed the salary theory as a fall-back position to protect convictions obtained under the "intangible rights" theory rejected by the Supreme Court in *McNally v. United States*.[31] Of course, the effect of *McNally*, at least in part, was repealed when Congress amended the mail fraud statute to include the "honest services" provision of § 1346.[32] Furthermore, while *Pasquantino* undoubtedly places restrictions on the reading of *Cleveland*, it does not necessarily support the application of a salary theory in the context of the facts before this court. Accordingly, the court must determine whether, in the context of a state ethics violation, salary and benefits constitute money and property under § 1341.

The salary theory has its origins in Justice Stevens's dissent in *McNally*. In his dissent, Justice Stevens suggested that a kickback scheme remained viable under the mail fraud statute based on a salary theory.[33] Specifically, he explained:

> When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer— who is not getting what he paid for. Additionally, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is

---

**31.** 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

**32.** Prior to the *McNally* decision, the mail fraud statute had been interpreted to include schemes to defraud persons of their intangible right to honest government. In *McNally*, the Court held that § 1341 was limited to money and property losses exclusively. Congress then legislatively overruled *McNally* by broadening the mail fraud statute to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. As the government points out in its brief, the mail fraud statute can once again be used to prosecute such things as corruption by public servants and embezzlement by campaign officials; however, it does not reach schemes to deprive citizens of fair elections because such schemes do not include any identifiable victim of the "honest services" of a fiduciary. Govt.'s Memo in Opp. at 3–4 (doc. 32). Additionally, the Fifth Circuit has ruled that § 1346 applies only if the official acts or fails to act contrary to the requirements of his job under state law. *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir.1997). Considering there are no allegations that the defendant acted or failed to act contrary to the requirements of his job, the government concedes it cannot invoke § 1346 in this case. Therefore, the government relies on the "salary theory" as an avenue to prosecute the defendant solely under § 1341.

**33.** *McNally*, 483 U.S. at 377 n. 10, 107 S.Ct. 2875 (Stevens, J., dissenting).

subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency § 403 (1958). This duty may fulfill the Court's "money or property" requirement in most kickback schemes.[34]

The text of Justice Stevens's dissent is clear to the extent he is addressing kickback schemes. His statement connects the breach of loyalty to the employer who pays the employee some salary. In the case at bar, the duty to submit accurate and truthful campaign finance disclosure reports was owed to the Board of Ethics and the defendant is not accused of depriving money or property from the Board. Thus, it is unclear as to whether the dissent applies to a case in which the alleged breach involves a duty to a party that was deprived of no money or property.

It is equally uncertain whether Justice Stevens intended to encompass scenarios that are not kickback schemes. Due to these questions and the fact that the dissent is not binding precedent, the court must thoroughly analyze the jurisprudence which has adopted and rejected Justice Stevens's dissent and the resulting salary theory.

### (1) Discussion of the salary theory within the Fifth Circuit.

The government argues that the Fifth Circuit has, on two occasions, quoted with approval Justice Stevens's discussion of the salary theory. First, the government claims that the Fifth Circuit approved of the salary theory in *United States v. Richerson*.[35] The defendant, Richerson, was

involved in a scheme to steer his employer's money to certain vendors who were willing to pay him bribes.[36] The vendors would then recoup some of the bribes through false invoices submitted to the defendant's employer.[37] Richerson was convicted of conspiracy to commit mail fraud and two counts of attempted willful tax evasion.

On appeal, Richerson contended that the *McNally* decision required a reversal of his conviction because the district court's jury charge included language regarding intangible rights.[38] The Fifth Circuit stated that the overriding and predominant theory of the government's case involved the employer's loss of money and property.[39]

The money or property which the court alluded to was, in part, the actual money spent by the employer on false invoices, not the salary obtained by Richerson. The court noted that to the extent the case involved intangibles at all, they were related to property as suggested by Justice Stevens's dissent.[40] In the end, the court held that any error in the district court's charge did not rise to the level of plain error.[41] At best, it may be argued that the Fifth Circuit would look favorably upon a salary theory in the context of a kickback scheme. It certainly cannot be said, however, that the Fifth Circuit adopted Justice Stevens's dissent where there is no kickback scheme. Therefore, the court is unpersuaded that *Richerson* mandates that the salary theory be applied in the instant case.

34. *Id.*

35. 833 F.2d 1147, 1157 (5th Cir.1987).

36. *Id.* at 1149.

37. *Id.*

38. *Id.* at 1156.

39. *Id.* at 1157.

40. *Id.*

41. *Id.*

The government next argues that the Fifth Circuit approved of the salary theory in *United States v. Fagan*.[42] The defendant, Fagan, owned two companies engaged in leasing work boats and crew boats to offshore drilling companies.[43] Fagan would bribe the manager of drilling at Texoma Production Company in the amount of $100 a day for each boat that Texoma leased from Fagan's companies.[44] Fagan was convicted of, among other things, aiding and abetting on nine counts of mail fraud.[45]

On appeal, Fagan argued the evidence was insufficient to show that the scheme was one to defraud.[46] He claimed that Texoma was not defrauded because he absorbed the costs of the kickbacks himself, and his leasing rates remained competitive.[47] The Fifth Circuit rejected this argument and held that "[i]n an unregulated market, the detriment necessary for a finding of mail fraud ... would be shown by mere receipt of kickbacks."[48] If Texoma's manager had not violated his duty to disclose, Texoma might have captured for itself the large sums that the drilling manager was collecting as bribes.[49] This is because Texoma would have known that Fagan was willing to lease his boats for less money.[50] Therefore, the court found there was clearly an economic value and the scheme was calculated to deprive Texoma of this economic benefit.[51]

The *Fagan* court merely quotes Justice Stevens's dissent in *McNally* in a footnote and prefaces its discussion of the dissent by stating that the *Fagan* opinion was prepared prior to the Supreme Court's decision in *McNally*.[52] The Fifth Circuit's analysis of the dissent is clearly connected to its discussion of kickback schemes, which is not applicable to the case at bar. During oral argument, the government conceded the Fifth Circuit has neither adopted nor rejected the applicability of the salary theory to a case with facts such as those before the court now. For these reasons, the court finds that the *Fagan* decision does not require the application of the salary theory to the case at hand. Considering that neither the Supreme Court nor the Fifth Circuit has required the lower courts to adopt a salary theory in a case such as this, the court must analyze the relevant jurisprudence within other Circuits.

### (2) The salary theory as examined outside of the Fifth Circuit.

The government cites several cases from other circuits for the proposition that the salary theory has been applied in a variety of scenarios. The court begins its analysis of the jurisprudence with *United States v. Granberry*.[53] In *Granberry*, the Eighth Circuit was confronted with a defendant who allegedly obtained a Missouri school bus operator permit by fraud.[54] Specifical-

---

42. 821 F.2d 1002 (5th Cir.1987).

43. *Id.* at 1005.

44. *Id.*

45. *Id.*

46. *Id.* at 1008–09.

47. *Id.* at 1009.

48. *Id.* at 1009 (citing *United States v. Ballard*, 680 F.2d 352, 354 n. 5 (5th Cir.1982)).

49. *Id.*

50. *Id.*

51. *Id.* at 1009–10.

52. *Id.* at 1010 n. 6.

53. 908 F.2d 278 (8th Cir.1990).

54. *Id.* at 279.

ly, Granberry concealed he had been convicted of first degree murder both on his application for a permit and on a job application that he submitted to the school district.[55] The court held, in part, that the school district had been deprived of money in the very elementary sense that its money had gone to a person who would not have received it if all of the facts had been known.[56]

*Granberry* is factually distinguishable from this case because the falsified documents were delivered directly to the entity that paid the salary. In the instant matter, the falsified documents were sent to the Board of Ethics and Livingston Parish later paid the salary and benefits to the defendant. However, the government correctly states that the Fifth Circuit has previously held that there is no statutory requirement that direct misrepresentations be made to the victims of the scheme.[57] Therefore, this particular distinction is immaterial.

*Granberry* is also distinguishable in that the salary was going to a person who unequivocally would not have received the wages if all of the facts had been known. If the conviction had been known, the State would not have issued him a license, nor would the School District have hired him.[58] Accordingly, the material omissions in Granberry's applications rendered him unqualified for the position in question.

This distinction is relevant insofar as the defendant in the case at bar was duly elected to the position of Parish President. Although the government contends that Livingston Parish citizens may not have voted for the defendant had they known the true source or amount of his campaign contributions, it cannot be said that an unqualified candidate was elected. The defendant's alleged violations of the Campaign Finance Disclosure Act did not render him unqualified to run for office. Instead, violations of the Act subjected the offender to state civil and criminal penalties. Accordingly, the court is unwilling to apply the analysis in *Granberry* to the case at bar.

The government next presents *United States v. Walker* as the most recent example in which the Eighth Circuit purportedly approved of the application of the salary theory to an election fraud case.[59] The defendant, Walker, was involved in a scheme to ensure the reelection of a city official.[60] The incumbent city official was African–American, and he was opposed by a white candidate.[61] Walker, and others, devised a scheme in which a second white candidate would enter the race in order to draw votes away from the leading white candidate.[62] The defendant secretly funded the second white candidate.[63] The basis for his mail fraud conviction was a false campaign finance disclosure report that was sent through the mail.[64]

The jury in *Walker* was first asked whether the defendant knowingly participated in a scheme to defraud the people of

55. *Id.*

56. *Id.* at 280.

57. *United States v. Pepper,* 51 F.3d 469, 473 (5th Cir.1995)(holding direct misrepresentations were not required for mail fraud conviction).

58. *Granberry,* 908 F.2d at 279.

59. 97 F.3d 253 (8th Cir.1996).

60. *Id.* at 254.

61. *Id.*

62. *Id.* at 254–55.

63. *Id.* at 255.

64. *Id.*

the "honest services" of the candidates.[65] As stated earlier, the government in the instant case has not alleged a scheme to defraud the people of "honest services;" therefore, the first question in *Walker* is inapplicable to the case before this court. The *Walker* jury was also asked whether the defendant knowingly participated in a scheme to defraud the people of the city official's salary and other benefits of a fair election.[66] This second question is the so-called "salary theory." The jury answered yes to each of these questions.[67] On appeal, Walker argued the instructions were defective in that they did not require the jury to agree unanimously on the same object.[68] With regard to this issue, the Eighth Circuit held the jury was adequately instructed on the unanimity requirement.[69] Hence, the issue on appeal did not require the appellate court to analyze the aforementioned salary charge. The undersigned is therefore reluctant to extend *Walker* to the case at hand.

Next, the government cites *United States v. Doherty* for the proposition that the salary theory is appropriate in the instant case.[70] Because *Doherty* was rendered post-*McNally* and prior to the § 1346 amendment, the First Circuit found the indictment improperly charged a conspiracy to deprive citizens of their intangible right to good government.[71] However, the indictment properly charged a conspiracy to deprive the government of money or property; namely, a scheme to obtain the salaries of those improperly promoted by means of fraudulent pretenses.[72] In particular, the object of the conspiracy was for the defendants to receive the benefits of promotion, including increased salary and pension benefits, by using stolen civil service examinations.[73] The court rejected the notion that a scheme to obtain promotions by cheating on exams is not a scheme to deprive the Commonwealth of property or money.[74] Thus, the court stated that "[g]etting jobs by false pretenses falls within the prohibition of § 1341 because it 'deprived' the Commonwealth 'of control over how its money was spent.' "[75] The First Circuit's language undoubtedly supports the government's theory in this case.

However, the defendant in the instant matter argues that the *Doherty* court, as well as other courts, employed this theory as a fall-back position to protect pre-*McNally* indictments. The defendant further argues that once those cases were resolved, the application of the salary theory begins to disappear from the jurisprudence. Although the defendant's argument is persuasive, the court cannot simply ignore the number of decisions that have utilized the salary theory. Therefore, the undersigned's examination of this subject must continue.

A prime example of the conflict that this court is presented with can be found in two conflicting United States District Court opinions decided in the state of Kentucky.

65. *Id.*

66. *Id.*

67. *Id.*

68. *Id.*

69. *Id.*

70. 867 F.2d 47, 54–57 (1st Cir.1989)

71. *Id.* at 55.

72. *Id.* at 56.

73. *Id.*

74. *Id.* at 60.

75. *Id.*

First, in *United States v. George*[76] the defendant was accused of procuring absentee ballots from the county clerk, fraudulently voting those ballots, and then mailing them to the clerk for tabulation. The first count of the original indictment charged the defendant with using the mails to defraud the citizens of their intangible right to an honest election.[77] However, while the matter was pending before the district court, the Supreme Court announced its decision in *McNally*; therefore, the government was unable to continue with its prosecution under the theory that the defendant had defrauded the citizens of their intangible right to an honest election.[78] In a clever attempt to avoid the *McNally* decision, the government next alleged in a superceding indictment that the defendant was involved in a scheme to deprive the taxpayers and voters of public funds (i.e. the salary and expenses payable to the officeholder).[79] In its analysis, the court found that "[h]ad the schemes succeeded, the taxpayers and voters of Marion County would not have been deprived of any money or property."[80] Instead, the voters "would have been deprived of the right to determine whom the money was to be paid."[81] Accordingly, Judge Ballantine observed that the superceding indictment was nothing more than an attempt to write around the language of *McNally*, and the "citizenry lost no money or property but only the intangible right legally to elect their County Judge/Executive."[82]

As compared to the case before this court, the citizens of Livingston Parish lost no money or property, but only the intangible right to a fair election in which campaign contributions were correctly reported. The government in the instant case is not seeking to write around the language of *McNally*; rather, it is attempting to avoid the fact that it cannot invoke the honest services provision of § 1346. As such, the *George* decision tends to support the defendant's argument on this issue.

However, conflicting with the *George* decision, and in support of the government's theory, is *United States v. Webb*.[83] In *Webb*, the Western District of Kentucky applied the salary theory to a defendant who allegedly schemed to procure false absentee ballots which were mailed to the county for tabulation in the Sheriff's election.[84] The court held that the indictment properly alleged a mail fraud offense, even though the salary would have been paid to the sheriff regardless of the scheme.[85] In *Webb*, Judge Meredith disagreed with the reasoning set forth in *George* insofar as *George* found that no loss could as a matter of law be alleged when the salary at question would have been paid anyway.[86] Thus, Judge Meredith reasoned that "[t]he problem with the interpretation by Judge Ballantine [in *George*] ... is that it excludes from the mail fraud statute activity that traditionally falls within the ambit of the statute."[87] As an example, Judge Meredith wrote: "Would a hospital be no less defrauded by paying the regularly

76. 1987 WL 48848 (W.D.Ky. Oct. 20, 1987).

77. *Id.*

78. *Id.*

79. *Id.*

80. *Id.* at *2.

81. *Id.*

82. *Id.*

83. 689 F.Supp. 703 (W.D.Ky.1988).

84. *Id.*

85. *Id.*

86. *Id.* at 706.

87. *Id.* at 707.

budgeted salary of an unqualified surgeon than if the salary were not a regular budget item?"[88] This court finds the above example unpersuasive in that the defendant in the case at bar was not an unqualified candidate. The court is therefore unwilling to apply the analysis utilized by the *Webb* court. Furthermore, there is jurisprudential support for the analysis utilized by Judge Ballantine in *George*.

For example, in *Ingber v. Enzor* the defendant was convicted of violating the mail fraud statute in connection with his election to the office of Supervisor of the Town of Fallsburg.[89] In *Ingber*, the government charged, *inter alia*, that the defendant falsified voter registration forms, applications for absentee ballots, and absentee ballots which were then cast in the defendant's favor and tabulated by the Board of Elections.[90] In Count Nine of the *Ingber* indictment, the jury was asked to find that the fraud had either one of two purposes: (1) to defraud the public of the intangible right to honest elections, or (2) to obtain money or property, specifically, the salary and privileges of the Office of Supervisor by false pretenses.[91] The government suggested that the second purpose was distinct and separate from the intangible right to honest elections. The

court was not convinced by this argument and found "the scheme to get the salary and perquisites of office was essentially the same thing as the scheme to defraud the public of its right to a fair election."[92]

The case here presents similar facts to that of *Ingber*, namely, the alleged scheme to get the salary of the Livingston Parish President is the same thing as the scheme to defraud the public of its right to a fair election.[93] Unfortunately, because the government cannot invoke § 1346 in this case,[94] it has attempted to use the salary theory as a way around its inability to charge the defendant with defrauding the citizens of Livingston Parish of their right to a fair election. It is certainly true that other courts have either disagreed with the *Ingber* decision or interpreted it differently.[95] Nevertheless, the undersigned is not willing to permit the government to expand the reach of § 1341 by allowing it to utilize the questionable salary theory.

Finally, in *United States v. Goodrich*,[96] the Eleventh Circuit was presented with an opportunity to accept or reject the salary theory. For reasons this court finds compelling, it chose the latter.[97] In *Goodrich*, the defendant was indicted for his participation in a bribery scheme involving

88. *Id.*

89. 664 F.Supp. 814, 815 (S.D.N.Y.1987).

90. *Id.*

91. *Id.* at 820.

92. *Id.* at 821.

93. The court is aware that the Second Circuit's affirmation of *Ingber* might be construed as an implied approval of the salary theory. *See Ingber v. Enzor*, 841 F.2d 450, 456 (2nd Cir.1988); *See also United States v. Myerson*, 1988 WL 68143 at *2 (S.D.N.Y. June 21, 1988) (stating "[b]y implication, the Second Circuit considered the deprivation of the

position and salary of Supervisor to be a property right protected by the mail fraud statute"). However, the undersigned remains inclined to agree with the reasoning put forth by Chief Judge Brieant in the District Court's opinion, *Ingber*, 664 F.Supp. at 821, which was not expressly rejected by the Second Circuit.

94. *See Brumley*, 116 F.3d at 734 (5th Cir. 1997).

95. *See, e.g. Webb*, 689 F.Supp. at 707; *Myerson*, 1988 WL 68143 at *2.

96. 871 F.2d 1011 (11th Cir.1989).

97. *Id.* at 1013.

the Board of County Commissioners.[98] The stated object of the mail fraud scheme was to defraud the citizens of their right to the honest, faithful, and disinterested services of the County Commissioners.[99] After the indictment was returned, the Supreme Court issued its decision in *McNally*, which, as described earlier, held that a scheme to defraud the citizens of their intangible right to honest government did not constitute mail fraud.[100] Therefore, just as in *George*, a superceding indictment was returned and the defendant was charged with defrauding the citizens of the salaries, emoluments, and services of elected officials.[101] The Eleventh Circuit rejected the government's attempt to utilize the salary theory and held that the property interest alleged to have been denied the victim—the salary—was indistinguishable from the intangible right to good government.[102] As applied to the case at bar, the undersigned finds that the alleged object of the mail fraud, the salary and benefits, is indistinguishable from the intangible right of honest services described in § 1346. Considering that the government cannot invoke § 1346 in this case, the undersigned concludes that to permit the government to utilize the salary theory

here would be tantamount to allowing it to expand § 1341 to include offenses that are properly under § 1341 only when § 1346 has been invoked.[103]

Although there is jurisprudence to support the government's position on the salary theory, the Fifth Circuit, in *Brumley*,[104] demonstrated its willingness to limit the scope of § 1346. According to one legal scholar, the *Brumley* decision is the minority rule and in conflict with the law in other circuits.[105] Therefore, it might be said that the Fifth Circuit would be equally inclined to limit the government's use of the salary theory in an attempt to avoid its inability to utilize § 1346. In addition, the Supreme Court has noted that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."[106] For these reasons, and the analysis applied in *George*,[107] *Ingber*,[108] and *Goodrich*,[109] the court finds that the salary theory is inapplicable to the case at bar. The problem with this mail fraud indictment is that the alleged criminal acts committed by the defendant, insofar as they relate to the information submitted to the Board of Ethics, should be prosecuted under the applicable state law.[110] The undersigned is

98.  *Id.* at 1012.

99.  *Id.*

100.  *Id.*

101.  *Id.*

102.  *Id.* at 1013; *but see United States v. Johns*, 742 F.Supp. 196, 204 (E.D.Pa.1990) (declining to follow the holding and analysis utilized in *Goodrich*).

103.  18 U.S.C. § 1346 does not create a new offense, but only further defines a pre-existing offense. *United States v. Hooten*, 933 F.2d 293, 297 (5th Cir.1991).

104.  116 F.3d 728.

105.  Julie R. O'Sullivan, *Federal White Collar Crime* at 373 (West Group; St. Paul, 2001).

106.  *Cleveland*, 531 U.S. at 25, 121 S.Ct. 365 (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)).

107.  1987 WL 48848 at *2.

108.  664 F.Supp. 814.

109.  871 F.2d 1011.

110.  The applicable state criminal penalty is a sentence not to exceed six months in the parish jail, or a fine of not more than $500.00, or both. La. R.S. 18:1505.6(B)(2). Furthermore, the procedure for state criminal enforcement of the Campaign Finance Disclosure Act is set forth at La. R.S. 18:1511.6.

cognizant of the federal government's interest in eliminating political corruption; however, this court will not partake in what has been described by other courts as the federalizing of garden-variety state crimes.[111] As such, the court finds the indictment against the defendant fails to set forth that Livingston Parish was defrauded of money or property as required by § 1341. Accordingly, the court will grant the defendant's motion to dismiss counts one through fourteen of the indictment.

**B. Even if the salary theory were accepted in this case, the defendant argues the government cannot prove specific intent as required by § 1341.**

For the purposes of the argument set forth here in Section III(B), the court assumes the salary theory is permissible and the indictment properly alleges all the elements required under § 1341, including that the scheme to defraud involved money or property. The defendant argues that even if the prosecution can prove the factual allegations in the indictment, it will have proved only that the defendant engaged in a scheme to deceive the state Ethics Board. The alleged harm, as stated above, is the receipt of salary and benefits from Livingston Parish. Thus, the defendant further contends that those allegations fail as proof of a specific intent to defraud Livingston Parish. Finally, the

defendant suggests that the indictment attempts to connect the specific intent to a harm different from the one actually intended.

On the other hand, the government argues that specific intent need not be alleged in the indictment,[112] and that it is a factual question to be resolved by the jury.[113] Accordingly, the government claims that intent is a factual issue and a motion to dismiss is not the proper vehicle for raising such defenses. The Fifth Circuit has expressly stated, "[w]hether there is intent to defraud is a jury question."[114] Therefore, the court is inclined to agree with the government as to the defendant's argument on specific intent.

That being said, it must still be shown that there is a nexus between the defendant's alleged fraudulent scheme and his use of the mails in furtherance of that scheme.[115] This nexus must be established in order to prove a crime under 18 U.S.C. § 1341 and, furthermore, is the basis for exerting federal jurisdiction over the crime of mail fraud.[116] Whether the defendant's mailings constitute a use of the mails in furtherance of a scheme to obtain money or property, assuming the salary theory were cognizable, is doubtful. Nevertheless, if the government's salary theory were permissible, the government would be permitted to present evidence pertaining to the relevant mailings and the fact

**111.** See United States v. Schermerhorn, 713 F.Supp. 88, 91 (S.D.N.Y.1989) (citing Ingber, 664 F.Supp. at 816–18).

**112.** See Caldwell, 302 F.3d at 409.

**113.** See United States v. Stephens, 779 F.2d 232, 236 (5th Cir.1985); United States v. O'Keefe, 722 F.2d 1175, 1181 (5th Cir.1983).

**114.** Stephens, 779 F.2d at 236 (citing Shale v. United States, 388 F.2d 616, 618 (5th Cir. 1968)).

**115.** .See United States v. Evans, 148 F.3d 477, 483 (5th Cir.1998).

**116.** Id. (citing United States v. Vontsteen, 872 F.2d 626, 628 n. 2 (5th Cir.1989), cert. denied, 498 U.S. 1074, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991), superseded on other grounds, 950 F.2d 1086 (5th Cir.1992) (en banc), cert. denied, 505 U.S. 1223, 112 S.Ct. 3039, 120 L.Ed.2d 908 (1992)).

finder would then be required to determine if the required nexus has been met. Assuming *arguendo* that the salary theory would be permissible under § 1341, the court declines to dismiss the mail fraud counts at this time under a theory that specific intent or the required nexus cannot be proved under these facts.

### C. The defendant's third and final argument is that the mail fraud statute "as applied" in this indictment violates the Commerce Clause.

■ This court has already dismissed the mail fraud counts for the reasons assigned in Section III(A). It is well-established that it is improper to reach a constitutional issue if a case can be disposed of on other, non-constitutional grounds.[117] Accordingly, the undersigned does not address the defendant's third and final argument in his motion to dismiss. At this point, the only issue that remains is the defendant's motion to strike.

### IV. Defendant's Motion to Strike (doc. 23)

■ The defendant suggests this court should strike several paragraphs of the indictment pursuant to Rule 7D of the Federal Rules of Criminal Procedure. First, he asks the court to strike a portion of paragraph 19(a) which reads: "The cash was supplied by a wealthy supporter of defendant Ratcliff's campaign who had a financial interest in Waste Management's operation of the Woodside Landfill (wealthy supporter)." Second, he argues the court should strike item B under paragraph 19 that reads: "The loan was secured by the pledge of $55,000 in cash supplied by the wealthy supporter." Lastly, the defendant seeks to strike item D

under paragraph 19 that reads: "On or about November 22, 1999, a Waste Management, Inc. lobbyist provided approximately $44,100 in cash to defendant Ratcliff's political consultant." Inasmuch the aforementioned portions of the indictment are relevant to the dismissed mail fraud counts, the court will deny the defendant's motion to strike as moot.

### V. Conclusion

For the reasons assigned herein, the defendant's motion to dismiss (doc. 22) counts one through fourteen of the indictment is hereby GRANTED and the defendant's motion to strike (doc. 23) is hereby denied as moot.

---

117. *See, e.g. Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, Freight Handlers, Express* and Station Employees, et. al., 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).