**UNITED STATES of America,**

v.

**Richard E. SCHERMERHORN, Defendant.**

**No. SS 88 Cr. 659 (GLG).**

United States District Court, S.D. New York.

May 11, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Thomas McC. Souther, Michael L. Tabak, Asst. U.S. Attys., of counsel), for U.S.

Michael Kennedy, P.C., New York City (Michael Kennedy, Kenneth M. Tuccillo, of counsel), for defendant.

OPINION

GOETTEL, District Judge:

Defendant has been indicted, *inter alia,* on charges of mail fraud stemming from his 1984 campaign for reelection to the New York State Senate. The gravamen of the mail fraud counts is that defendant received illegal campaign contributions from an individual he knew to be an underworld figure and that defendant failed to disclose those contributions as required by N.Y. Elec. Law § 14–104 (McKinney 1978). These crimes ostensibly are "federalized" due to defendant's use of the United States mails in submitting false campaign disclosure statements.

Defendant moves to dismiss the mail fraud charges (counts one through four) as infirm under the teaching of *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* held that the mail fraud statute was "limited in scope to the protection of property rights," and that such rights did not include the citizenry's intangible right to honest and impartial government. *Id.* 107 S.Ct. at 2881. The Court subsequently clarified that *McNally* created no tangible/intangible distinction under the statute, and that certain intangible interests, such as confi-

dential business information and its attendant use, may comprise "property" rights within the statute's scope. *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 320–21, 98 L.Ed.2d 275 (1987). In reaching that conclusion, however, the Court again emphasized that whatever else may comprise the class of protected, intangible property rights, the "statute does not reach 'schemes to defraud citizens of their intangible right to honest and impartial government'...." *Id.* 108 S.Ct. at 320 (quoting *McNally*, 107 S.Ct. at 2879). Following therefrom, this circuit has since held that the citizenry's intangible right to free and fair elections falls within the good-government intangible held by the *McNally* Court to be beyond the statute's reach. *Ingber v. Enzor*, 664 F.Supp. 814, 820 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 450, 456 (2d Cir.1988).

The Government, constrained by *McNally* and *Ingber*, does not allege that the defendant schemed to defraud the State of New York of its right to honest services or a fair election; rather, the indictment states that the defendant used the mails on four separate occasions in 1984 to provide the New York Board of Elections with false and fraudulent financial disclosure statements, and that these mailings were in furtherance of a scheme by the defendant to defraud the State of New York and its taxpayers of salary and other monetary benefits provided a duly elected state senator. There is no doubt that such conduct, if proved, was punishable on a good-government theory pre-*McNally*. In addition, such conduct would be punishable today on the same theory since Congress has since statutorily overturned *McNally*, expressly providing that schemes to defraud "another of the intangible right to honest services" fall within the ambit of the statute. Pub.L. No. 100–690, § 7603(a), 102 Stat. 4508 (1988) (codified at 18 U.S.C. § 1346).[1] The question before us is whether counts one through four of the indictment, craftily constructed in an effort to evade the good-government pitfalls delineated in *McNally* and *Ingber*, survive reasoned scrutiny under those precedents. We think the question is extremely close; in a different forum, the pros and cons of the arguments before us might comprise the stuff of a Tevya soliloquy. Conceding the precariousness of our conclusion, we think the Government's charge must be sustained in light of the subtleties attending the Second Circuit's decision in *Ingber*.

The *Ingber* facts were neatly summarized by the Second Circuit as follows:

Ingber was convicted for mail fraud in connection with his election and tenure as Supervisor for the Town of Fallsburg, New York. The indictment charged that Ingber, by falsifying voting documents including absentee ballots cast in the election, had defrauded the citizens of Fallsburg "of their ballots and their right to a fair and impartial electoral process," and that he had obtained through fraud "the salary, powers and privileges of the Office of Supervisor" ("count nine" or the "election fraud scheme"). In addition, Ingber was charged, *inter alia*, with using the mails as part of a scheme to conceal his interest in co-defendant Service Scaffold, Inc. ("Scaffold") in order to steer a $540,000 town sewer project to Scaffold [in which Ingber had an interest], thereby depriving Fallsburg of his honest services while reaping a pecuniary benefit for Scaffold ("count five" or the "sewer fraud scheme").

*Ingber*, 841 F.2d at 451. Following issuance of *McNally*, the defendant moved to set aside the convictions obtained under counts five and nine pursuant to 28 U.S.C. § 2255. The district court, Chief Judge Brieant presiding, had little difficulty in reaffirming the conviction imposed under count five, 664 F.Supp. at 822, nor did the Second Circuit in sustaining that finding, 841 F.2d at 455–56.

---

1. This circumstance has led one court to conclude that mail fraud convictions obtained on a good-government theory pre-*McNally* should not be vacated since the new statute applies retroactively to encompass those offenses. *United* States v. Berg, 710 F.Supp. 438, 442–443 (E.D.N. Y. 1989). The instant indictment does not contain a good-government charge, so we need not pass upon the propriety of that holding.

As to count nine, the district court had charged the jury on the alternative theories propounded in the indictment—loss of honest elections and loss of salary. The Chief Judge held that depriving the voters of their right to honest and fair elections no longer constituted an indictable offense for mail fraud in light of *McNally*. 664 F.Supp. at 820. The Second Circuit affirmed that holding. 841 F.2d at 456. The Government contended, however, that the conviction under count nine should nonetheless be sustained since (i) the alternative theory charged—a scheme to defraud the public of money or property, to wit, the defendant's salary as Town Supervisor—was still valid after *McNally* and (ii) the jury de facto issued a special verdict indicating that it was convicting defendant under count nine based on the deprivation-of-salary charge.

The latter assertion was based on a colloquy between the Chief Judge and the jury foreperson who, after being polled on count nine in open court, first answered "undecided," then "not guilty," and finally "guilty." In response to questioning by the Chief Judge designed to ascertain and verify the foreperson's vote on count nine, the foreperson indicated that the jury had agreed to convict on count nine based solely on the deprivation-of-salary charge, and that no such agreement had been reached as to the alternative grounds of depriving the town of its right to a fair election. With that clarification, all the jurors then affirmed their vote to convict on count nine. The district court held that this colloquy, designed to ascertain and verify the foreperson's vote, "should not be allowed to substitute for the careful procedures required to elicit the unusual result of a special verdict." 664 F.Supp. at 821. Consequently, because only a general verdict had been issued, and because that general verdict was tainted by a fair-election charge no longer permissible in light of *McNally*, the conviction on count nine was vacated. The Second Circuit affirmed that holding as well. 841 F.2d at 456.

The Chief Judge went on, however, to conclude that "[e]ven if the foreperson's statements were deemed a special verdict

..., the Court concludes that payment of the [defendant's] salary, a routine and budgeted Town expenditure, ... does not constitute a loss of money or property as contemplated by *McNally* and the mail fraud statute." 664 F.Supp. at 821. The Chief Judge, citing *McNally*, 107 S.Ct. at 2882, reasoned that this money "would have been paid to *some* victorious candidate, regardless of Ingber's attempt to control the outcome of the election." 664 F.Supp. at 822. In essence, the Chief Judge held that the real scheme to defraud was that of rigging the election, and the defendant's salary was a necessary but legally insignificant incident thereto. As the Chief Judge put it, "the scheme to get the salary and perquisites of office was essentially the same thing as the scheme to defraud the public of its right to a fair election." 664 F.Supp. at 821. *See also United States v. George*, No. Cr. 86–00123–L(B), 1987 WL 48848 (W.D.Ky. Oct. 20, 1987) (Ballantine, J.) (LEXIS) (following district court's ruling in *Ingber* on this issue).

The Second Circuit, in affirming the Chief Judge generally, failed to address expressly this aspect of the district court decision. Consequently, the defendant contends that Chief Judge Brieant's decision on the government-salary charge should control and the mail fraud counts must be dismissed. The implicit meaning of the Second Circuit's decision, however, we think compels a different conclusion.

Finding that a special verdict had not been rendered in the original trial on count nine, the Second Circuit concluded:

> The jury in this case was charged in the alternative; *one of the theories of guilt* was based on a right to free and fair elections, impermissible in light of *McNally*. Since the jury was instructed to return a general verdict, Judge Brieant correctly concluded that doubt existed concerning the grounds for the jury's decision.

841 F.2d at 456 (emphasis added). Although not free from doubt, we think that pregnant in the above conclusion is the implicit belief that the alternative charge, based on the fraudulent attainment of a

public salary, survived *McNally* and was a legitimate ground for the jury's decision. We recognize that basing our holdings on what appellate courts ostensibly *say* is in itself often risky business, and to rest our conclusions on what was *not said* by an appellate court is a bit like predicting the future from tea leaves. Nonetheless, our conclusion is supported, we think, by several sources.

First, it is true that, given their express holdings on the fair-election charge and special-verdict issue, the conviction under count nine would have been vacated by the Second Circuit panel regardless of their decision as to the government-salary charge. It does not appear to us, however, that the panel's express holdings rendered moot the question as to the viability of the government-salary count. That count properly was set forth in the indictment; conviction under count nine had to be set aside given the charge to the jury, which was rendered erroneous by *McNally*. The option to retry Ingber on the government-salary charge, therefore, presumably existed.[2] Given the possibility of retrial, the government-salary charge seemingly had not been mooted by the court's express holdings and all parties before the *Ingber* court had a sufficient "stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Indeed, the issue had been argued and addressed below. Given this posture, it is hard to understand why the Second Circuit, by ignoring the issue, would have allowed the defendant, the Government, and the court to be put through the risk and expense of a retrial on the government-salary charge if it truly believed that charge also to be improper under *McNally*. The better conclusion, we think, is that the panel implicitly held to the contrary: by holding that *"one"* of the theories charged in *Ingber* was defective under *McNally*, and by identifying the defective theory as that based on the intangible right to fair elections, the alternative theory based on the fraudulent attainment of a government salary implicitly was held not to suffer from a *McNally* infirmity.

Second, undergirding Chief Judge Brieant's decision in *Ingber* is his belief, unequivocally and articulately set forth in his decision, 664 F.Supp. at 816–18, that the mail fraud statute had been grossly extended and misused to "federalize" garden-variety state crimes. Frankly, we share much of the Chief Judge's concern as to this seemingly insatiable interest in "federalizing" this country's entire corpus of state criminal and civil law in service of the misguided credo that "Federal courts are courts of *un*limited jurisdiction."[3] *See generally Greenberg v. Veteran*, 710 F.Supp. 962 (S.D.N.Y. 1989). It seems also that, particularly as to the excesses spawned by the mail fraud statute, Judge Miner, who authored the *Ingber* decision for the Second Circuit panel, shares this view. *See Ingber*, 664 F.Supp. at 818 (citing Judge Miner's published concerns that mail fraud statute has been misused and infringes on the concept of federalism). It seems strange, therefore, that Judge Miner would let slip by an opportunity to delineate clearly that the government-salary charge rejected by Chief Judge Brieant also ran afoul of *McNally*, particularly since retrial of this issue was a possibility. The more likely conclusion is that, for whatever reasons, he did not believe this to be so or, at the least, he was unable to get a second member of the *Ingber* panel to join him in a contrary conclusion. In either event, the implication if not the holding of *Ingber* is that the government-salary charge survived *McNally*.[4]

---

**2.** We were told at oral argument on the instant motions that Ingber, for whatever reasons, was not retried on this count. The Government, however, advised that it believed a retrial on this count existed as a valid option.

**3.** The correct proposition, of course, is that "federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S.

365, 374, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978).

**4.** We note that our federalist concerns are somewhat mollified in this case given the obvious public interest in rooting out *legally recognized* political corruption. In this case, unlike so many earlier mail fraud indictments bottomed on good-government charges where the jury was

Further, *McNally* itself would not seem to forbid this conclusion. In *McNally*, Messrs. Gray, Hunt, and McNally conspired to ensure selection of Wombwell Insurance Company as the Commonwealth of Kentucky's agent for securing a worker's compensation policy. In return therefor, Wombwell agreed to funnel shares of commissions it received in excess of $50,000 a year to sham companies controlled by the defendants. The commissions were paid to Wombwell by insurance companies it had secured to provide Kentucky with insurance coverage.

In rejecting the mail fraud counts, the Supreme Court held: "It was not charged that in the absence of the alleged scheme the Commonwealth *would have paid a lower premium* or selected better insurance." *McNally*, 107 S.Ct. at 2882 (emphasis added). Chief Judge Brieant focused on the emphasized language, *Ingber*, 664 F.Supp. at 821, and the defendant focuses on it here. The argument, in essence, is that the defendant's salary was a budgeted expense that would have been paid to *someone*, if not defendant, in any event. Defendant's focus on the emphasized language, however, is at the expense of the remainder of that disjunctive clause—"*or secured better insurance.*" Had Kentucky received shoddy insurance coverage, regardless of the price paid, it appears to us that the *McNally* holding would have been different. As it was, Kentucky received what it bargained for—suitable insurance coverage at a competitive rate. That is not the case before us. Notwithstanding the fact that a previously budget-

ed salary was paid to defendant, the charges here, if proven, demonstrate that the State of New York might have "secured better [representation]" for the money it paid. Wholly apart from any breach by defendant of an ethereal duty to fairly and honestly serve the people of New York, the taxpayers in this case paid a salary for "damaged or contaminated goods" if the mail fraud counts here charged are proven. Notwithstanding the election of the James Michael Curleys of the world,[5] this court will not abide nor judicially sanction the conclusion that corrupt and non-corrupt elected officials are of equal value. Should it be proven that defendant engaged in the fraudulent scheme here alleged, we think a presumption arises that the citizenry could have secured a better state senator. *See United States v. Webb*, 689 F.Supp. 703, 707 (W.D.Ky.1988) (Meredith, J.) (rejecting district court's decision on government-salary charge in *Ingber* and noting that State did not get the benefit of the bargain because, given election fraud, it paid government salary to employee of lesser value).

In addition, sandwiched around the "lesser premium" language in *McNally* is the following:

[T]here was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property.... Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money.

*McNally*, 107 S.Ct. at 2882. This distinction between public versus private or third-

asked in essence to make moral judgments about an official's behavior, the failure to disclose campaign contributors and their contributions is a recognized criminal violation under N.Y. Elec. Law § 14–104 (McKinney 1978). Yet our own experiences in this court have taught us that numerous illegal kickback, election, and like schemes involving state and local officials are, for whatever reasons, often not prosecuted by state law enforcers. It is empirically clear to us, therefore, that in the absence of federal intervention many of these political *crimes* would go unpunished and, perhaps worse, unnoticed or undiscovered. We are less leery about use of the mail fraud statute for federal prosecution of *illegal* state and local electioneering involving the mails and we think, if the

statute was narrowly confined to those circumstances, its use for such would be much more in the public interest. *See especially United States v. Margiotta*, 688 F.2d 108, 139–44 (2d Cir.1982) (Winter, J., dissenting) (decrying the use of mail fraud statute in political corruption cases when underlying "breach" does not even violate state law), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

5. If memory serves us correctly, James Michael Curley was once reelected Mayor of the City of Boston despite the fact that he had been convicted on political corruption charges and was serving time for that conviction.

party money was recognized by the Second Circuit in *Ingber* to be an important part of the *McNally* limitation, *Ingber*, 841 F.2d at 455, and superimposing a further, "net loss" condition on mail fraud requirements has been criticized.[6] Indeed, it has been suggested that too stingy a view of what constitutes tangible monetary or proprietary loss under the mail fraud statute would be inconsistent with the teaching of *McNally*.[7] Moreover, although it is true that in this case a salary would have been paid to an elected senator from defendant's district, it does not follow that *defendant* would have received that salary had he not committed the alleged fraud or, more importantly, that if he is convicted of the alleged fraud the State of New York necessarily will be out the entire salary paid as a "budgeted expenditure." *Cf. Ingber*, 664 F.Supp. at 822 (requiring Ingber, on conviction under count five outlined *supra*, to refund as restitution amount of losses sustained by town as result of fraudulently obtained sewer contract).

For all these reasons, we hold that counts one through four of the indictment survive this motion to dismiss. We add a note of caution, however, to the Government. In *Carpenter*, a reporter for the Wall Street Journal was prosecuted for disclosing and trading on confidential information he obtained in the course of his employment. The Court, in affirming the conviction and holding that such information was property (albeit intangible) within the meaning of the mail fraud statute, noted that "the object of the scheme was to take the Journal's confidential business information...." *Carpenter*, 108 S.Ct. at 320. Whether the Government can actually prove in this case that the object of the defendant's alleged scheme was to take the salary and monetary benefits that inure with election as a state senator is a matter that will take some work.

Given the uncertainties of the situation, we are in a position similar to that of the producers of the stage play *The Mystery of Edwin Drood*, based upon an unfinished work of Charles Dickens. With no prescribed ending and several possibilities, they left it to the audience to vote on the ending that best solved the mystery. In the traditions of that production, we leave the initial factual determination to the jury but reserve our right as critic to review the performance.

SO ORDERED.

---

**6.** *See Webb*, 689 F.Supp. at 707 ("net loss in the salary expended" need not be alleged so long as "money or property was put in jeopardy by the scheme"); *United States v. Thomas*, 686 F.Supp. 1078, 1085 (M.D.Pa.1988) (Nealon, C.J.) ("mail fraud statute does not require a net monetary loss incurred by the [government]").

**7.** *See United States v. Fagan*, 821 F.2d 1002, 1010 n. 6 (5th Cir.1987) (noting that although *McNally* restricted what might constitute intangible property rights under the statue, it cited favorably to the proposition that tangible property rights under the statute are broadly defined).