*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0377a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

LOREN GLENN TURNER,

        *Defendant-Appellant.*

Nos. 05-6326/6339

>

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 05-00013—Karen K. Caldwell, District Judge.

Argued: April 18, 2006

Decided and Filed: October 17, 2006

Before: MOORE and GIBBONS, Circuit Judges; SHADUR, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Chad A. Readler, JONES DAY, Columbus, Ohio, for Appellant. Kenneth R. Taylor, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Chad A. Readler, Mary Beth Young, JONES DAY, Columbus, Ohio, Mark D. Chandler, Louisville, Kentucky, for Appellant. Kenneth R. Taylor, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

———————————

## AMENDED OPINION

———————————

    JULIA SMITH GIBBONS, Circuit Judge. This appeal requires us to consider the application of the federal mail fraud statute to a case involving state election fraud. Defendant-appellant Loren Glenn Turner was indicted on charges arising from his involvement in two Kentucky state elections. The first was the May 2002 election of Donnie Newsome as Knott County Judge Executive. The second was the November 2002 election for Pike County District Judge, involving candidate John Doug Hays. The alleged election fraud included the use of "vote hauling" checks to buy votes

———————————

[*] The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

unlawfully;[1] the use of "straw contributors" who fraudulently donated money to the Hays campaign on behalf of one of Hays's prominent backers so as to avoid Kentucky's maximum individual contribution limits; the direct payment of cash to voters on election day to buy votes; the structuring of cash withdrawals used to repay straw contributors from bank accounts in the knowing attempt to avoid federal credit transaction reporting ("CTR") requirements; and unlawful direct cash payments to a candidate of amounts far above the maximum contribution allowed by Kentucky law.

A jury convicted Turner of mail fraud in connection with the Newsome campaign and conspiracy to commit mail fraud in connection with the Hays campaign. Turner's convictions were based on two alternate theories: first, that Turner participated in a scheme to defraud the citizens of Kentucky of the honest services of a candidate (Newsome or Hays) for public office (the "honest services theory"); and second, that Turner participated in a scheme to defraud the citizens of Kentucky of money or property – specifically, the salary and emoluments of the public office sought by Newsome or Hays (the "salary theory").

We reverse the judgment of the district court because Turner's conduct, as alleged in the indictment, may not be prosecuted under the mail fraud statute using either the honest services theory or salary theory of prosecution.

I.

Turner, a life-long Kentuckian, worked as an employee for Ross Harris, a wealthy and successful coal operator who had a reputation of having significant influence in regional politics.[2] In the fall of 2002, John Doug Hays ran as a candidate for Pike County District Judge. Although Harris had been noncommittal early in the district judge race, he eventually backed Hays. At some point during the Hays campaign, a local resident named Linda White contacted the Pikeville office of the Federal Bureau of Investigation concerning the activities of her ex-husband, Tom Varney, who was at that time working for the Hays campaign. White had been secretly recording her telephone conversations with Varney, and she turned tapes of those conversations over to the FBI. During the conversations, Varney bragged about Harris's involvement in the Hays campaign and his own relationship with Harris. Of interest to the FBI, Varney also discussed the use of "vote hauling" checks in the campaign. Varney repeatedly promised White two vote hauling checks but did not discuss any legitimate arrangement for her to transport voters. Varney said on the tapes that he gave a third check to his daughter so that she could buy a coat. Varney described "vote hauling" as a figure of speech and warned his daughter not to tell anyone that the check is for buying votes. Based on the tapes, the FBI began an investigation into alleged misconduct in the Hays and Newsome campaigns.

As a result of that investigation, a federal grand jury returned a seventeen-count indictment charging ten defendants with violations relating to the two Kentucky elections. Relevant to this appeal, the indictment charged Turner with conspiracy, pursuant to 18 U.S.C. § 371, to buy votes in violation of 42 U.S.C. § 1973i(c), and conspiracy, pursuant to 18 U.S.C. § 371, to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, in connection with the Hays campaign. Turner was also charged with mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, in connection with the Newsome campaign. With regard to the Hays campaign, the indictment alleged a two-part conspiracy. First, the defendants devised a scheme to avoid the $1,000 limit on personal campaign contributions under which straw contributors wrote personal checks for $1,000 to the Hays

---

[1] Vote hauling involves transporting voters who otherwise lack transportation to the polls on election day. Paying workers to provide transportation to voters in need is legal in Kentucky if done legitimately.

[2] Harris, who was tried along with Turner, died while this appeal was pending. Accordingly, his indictment has been dismissed.

campaign and were then reimbursed by Harris in cash. Harris was also alleged to have given unreported cash directly to Hays, who spent it as his own personal money in the election. According to the indictment, Turner participated in the scheme by assisting Harris in using straw contributors. The indictment alleged that the Hays campaign mailed to the Kentucky Registry for Election Finance (the "Registry") a campaign finance report falsely reporting that the campaign had received $1,000 contributions from each of at least twenty-one contributors when in fact the contributions were concealed donations from Harris. As the second part of the scheme, in an effort to utilize the contributions from Harris, the Hays campaign issued and distributed 680 checks in the amount of $50 to potential voters. Although the checks were ostensibly labeled "vote hauling" checks, their purpose was to influence voters. The checks were distributed with sample ballots showing voters how to vote for Hays, and the persons distributing the checks instructed voters to vote for Hays. The Hays campaign also gave cash directly to voters on election day. The Hays campaign also allegedly mailed the Registry a report of expenditures falsely claiming that 680 people had been paid fifty dollars for vote hauling, when in fact the money had been used to influence voters. With regard to the Newsome campaign, the indictment alleged that Harris, with Turner's assistance, funneled $20,000 to Newsome. In an election finance statement delivered through the mails, the cash contribution was hidden from the Registry when Newsome falsely reported that the source of the money was loans and personal contributions.

Before trial, Turner moved to dismiss the mail fraud charges in the indictment, arguing that the conduct alleged could not be prosecuted under either the honest services theory or salary theory of mail fraud. The district court denied his motion and allowed the prosecution to proceed on both theories. Following trial, the jury found Turner guilty of mail fraud and conspiracy to commit mail fraud on both the honest services theory and salary theory in connection with both the Hays and Newsome campaigns.[3] Turner was found not guilty of conspiracy to buy votes in connection with the Hays campaign. Turner was sentenced to forty-eight months imprisonment, three years supervised release, and a $10,000 fine.[4] This appeal followed.

## II.

The federal mail fraud statute, 18 U.S.C. § 1341, prohibits use of the mails by any person "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." Before 1987, § 1341 was used to prosecute a wide range of schemes to defraud individuals of "intangible rights" in addition to more typical schemes to defraud individuals of money or property. *See Cleveland v. United States*, 531 U.S. 12, 18 (2000). Defendants whose schemes involved deprivations of "intangible rights" included public officials who deprived citizens of their right to the official's honest services, private persons with clear fiduciary duties who defrauded their employers or unions by accepting kickbacks or selling confidential information, elected officials and campaign workers who deprived the citizenry of its right to an honest election, and defendants who defrauded individuals of their rights to privacy and other nonmonetary rights. *See McNally v. United States*, 483 U.S. 350, 362-64 (1987) (Stevens, J., dissenting) (noting various cases for each category).

In *McNally v. United States*, however, the Supreme Court invalidated the use of § 1341 to prosecute deprivations of "intangible rights," concluding that the mail fraud statute was "limited in scope to the protection of property rights." 483 U.S. at 360. If Congress intended to protect

---

[3]For all of the mail fraud counts, the verdict form contained a special question asking whether Turner was guilty of mail fraud under the intangible right of honest services and a second question covering the theory alleging that Turner devised a scheme to fraudulently obtain the salary of a public office.

[4]Following Turner's convictions for mail fraud and conspiracy, in a separate case (No. 5:05cr13), Turner was prosecuted for and pled guilty to perjury based on his grand jury testimony relating to this case.

intangible rights, the Court stated that "it must speak more clearly than it has." *Id.* Congress responded by quickly passing what has been called the "*McNally* fix": Section 1346, which defines "scheme or artifice to defraud" as including "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

A.

The first question we address is whether the election fraud alleged in the indictment falls within the scope of "the intangible right of honest services" protected under § 1346. In order to do so, we must consider whether the enactment of § 1346 revived the pre-*McNally* line of intangible-rights cases that allowed for prosecutions of election fraud using the mail fraud statute.

In interpreting a statute, this court looks first to its plain language. *See Cowherd v. Million*, 380 F.3d 909, 913 (6th Cir. 2004). The plain language of § 1346 supports appellants' position that the statute does not cover the conduct outlined in the indictment. While candidates may be dishonest in seeking election, such dishonesty does not deprive anyone of any right to honest "services" for the simple reason that candidates, unlike the elected officials that they hope to become, provide no "services" to the public. In the context of § 1346, however, our analysis cannot start and stop with the plain language of statute. Section 1346 was a specific, targeted legislative response to *McNally* and Congress utilized the "honest services" terminology of cases that preceded *McNally*. As the Supreme Court has said:

> It is a well-established rule of construction that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989)); *see Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense").

*Neder v. United States*, 527 U.S. 1, 21-22 (1999); *see also Riley v. Kurtz*, 361 F.3d 906, 915 (6th Cir. 2004). Because Congress employed a legal term of art when enacting the statute, the critical inquiry is what Congress understood "the intangible right of honest services" to mean based on prior caselaw, rather than what a dictionary definition of the term "services" might yield. *See United States v. Frost*, 125 F.3d 346, 365 (6th Cir. 1997) ("Accordingly, we must review Sixth Circuit precedent issued before *McNally* in order to discover the precise contours of the right in this circuit."); *accord United States v. Rybicki*, 354 F.3d 124, 135 (2d Cir. 2003) ("We would, we think, labor long and with difficulty in seeking a clear and properly limited meaning of 'scheme or artifice to deprive another of the intangible right of honest services' simply by consulting a dictionary for the literal, 'plain' meaning of the phrase."). We therefore turn to the question of whether the "intangible right of honest services," as that phrase is used in § 1346, includes the honesty of candidates for public office.

Prior to *McNally*, both the right to the honest services of elected officials and the right to the honest candidacy of an individual running for elected office were accepted applications of the mail fraud statute. As we have noted, "The classic application of the intangible right to honest services doctrine has been to a corrupt public servant who has deprived the public of his honest services." *Frost*, 125 F.3d at 365. Although the classic application related to an officeholder, it had generally become accepted pre-*McNally* that candidates for public office could be prosecuted under the mail fraud statute for fraudulent election schemes. *See, e.g.*, *United States v. Girdner*, 754 F.2d 877, 880 (10th Cir. 1985) (candidate for state legislature); *United States v. Odom*, 736 F.2d 104, 116 & n.13

(4th Cir. 1984) (sheriff); *United States v. Clapps*, 732 F.2d 1148, 1153 (3d Cir. 1984) (party chairman); *United States v. States*, 488 F.2d 761, 766-67 (8th Cir. 1973) (candidates for city office). A review of the prominent pre-*McNally* election fraud cases, however, reveals that none referred to the harm flowing from election fraud as a deprivation of a right to "honest services." Indeed, most of these cases recognized that the application of the statute to election fraud was a modification of the intangible right of honest services, defined as a right to an honest election. *See Clapps*, 732 F.2d at 1153; *States*, 488 F.2d at 765. Likewise, Justice Stevens, in his *McNally* dissent, categorized the pre-*McNally* intangible rights cases and expressly separated "honest services" and "honest election" cases. *See McNally*, 483 U.S. at 362-64 (Stevens, J., dissenting).

Against this precedential backdrop, § 1346, by its terms, did not restore the application of the mail fraud statute to all "intangible rights." Instead, § 1346 restored the applicability of the statute to deprivations of only the "intangible right of honest services." The Supreme Court, in *Cleveland v. United States*, 531 U.S. 12 (2000), recognized that § 1346 was a limited revival of intangible rights:

> Congress amended the law specifically to cover *one* of the "intangible rights" that lower courts had protected under § 1341 prior to *McNally*: "the intangible right of honest services." Anti-Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346. Significantly, Congress covered *only the intangible right of honest services* even though federal courts, relying on *McNally*, had dismissed, for want of monetary loss to any victim, prosecutions under § 1341 for diverse forms of public corruption, including licensing fraud.

*Id.* at 19-20 (emphasis added). Thus, § 1346 expressly limited application of the mail fraud statute to those cases involving deprivations of the intangible right of honest services, as distinguished from the intangible right to an honest election. Our previous statement, in *Frost*, "that § 1346 has restored the mail fraud statute to its pre-*McNally* scope" is not to the contrary. 125 F.3d at 364. In *Frost*, we explicitly recognized that the "pre-*McNally* scope"of the statute would be defined "according to previous opinions interpreting *the intangible right to honest services*." *Id.* (emphasis added); *see also id.* ("Congress intended the provision to reinstate the doctrine of intangible rights *to honest services*." (emphasis added)). Thus, in accordance with *Frost*, we now hold that the right to honest elections was separate and distinct from the right to honest services before *McNally*.

The legislative history of § 1346 further confirms that the statute revived the honest services cases to the exclusion of election-fraud cases. In response to *McNally*, Representative John Conyers introduced the Fraud Amendments Act of 1987,[5] which would have defined "fraud or defraud" as including "defrauding another . . . of intangible rights of any kind whatsoever in any manner or for any purpose whatsoever." 133 CONG. REC. E3240-02, 1987 WL 944184 (daily ed. Aug. 4, 1987) (statement of Rep. Conyers). The following year, the Anti-Corruption Act of 1988[6] was proposed. According to Senator Joseph Biden, the bill contained a provision "that addresses election fraud. . . . Section 225(b) of the bill makes it a criminal violation to deprive or defraud, or attempt to deprive or defraud, by any scheme or artifice, the inhabitants of a State, or political subdivision of a State, of a fair and impartially conducted election process." 134 CONG. REC. S16315-01, 1988 WL 177972 (daily ed. Oct. 14, 1988) (statement of Sen. Biden). Neither the Fraud Amendments nor Anti-Corruption Acts were ever enacted, however.

---

[5]*See* Fraud Amendments Act of 1987, H.R. 3089, 100th Cong. (1987).

[6]*See* Anti-Corruption Act of 1988, S. 2793, 100th Cong. (1988).

The Anti-Drug Abuse Act of 1988,[7] enacted as Public Law 100-690 on November 18, 1988, included an amendment to § 1346.[8] According to Representative Conyers, "This amendment restores the mail fraud provision to where that provision was before the *McNally* decision . . . ." 134 CONG. REC. H11108-01, 1988 WL 182261 (daily ed. Oct. 21, 1988) (statement of Rep. Conyers). In reference to this bill, Senator Biden stated that "[t]he intent is to reinstate all of the pre-*McNally* caselaw pertaining to the mail and wire fraud statutes without change." 134 CONG. REC. S17360-02, 1988 WL 182529 (daily ed. Nov. 10, 1988) (statement of Sen. Biden). However, unlike the Fraud Amendments and Anti-Corruption Acts, the amendment, as included in the Anti-Drug Abuse Act, did not expressly reference election fraud. For that reason, Senator Biden reintroduced the Anti-Corruption Act[9] the following year, acknowledging that the prior Congress had amended the mail and wire fraud statutes only "to define fraud to include a scheme to deprive a person of the intangible right to another's honest services." 135 CONG. REC. S1025-02, 1989 WL 169400 (daily ed. Feb. 2, 1989) (statement of Senator Biden). Senator Biden called the amended provision only a "stopgap," "temporary fix," and "partial solution." *Id.* The amendment had allowed the government to resume prosecution of public corruption cases involving the honest services of public officials, as well as some commercial bribery and other serious breaches of fiduciary duty. *Id.* However, according to Senator Biden, "current law does not permit prosecution of election fraud because such offenses do not involve anyone's 'honest services.'" *Id.*

In sum, the plain terms of the statute, the Supreme Court's discussion of the statute in *Cleveland*, and the legislative history of the statute all demonstrate that Congressional enactment of § 1346 did not revive those cases involving prosecutions under the mail fraud statute for deprivations of the intangible right of honest elections.[10]

Nor may Turner be prosecuted under § 1346 because the alleged scheme involved a deprivation of honest services as that term was understood before *McNally*. The district court assumed that, even though Congress did not explicitly restore election fraud cases, Turner's conduct could still be prosecuted under an honest services theory so long as it fit within the "honest services" cases existing before *McNally* and thereby expressly revived by § 1346. Attempting to fit this election fraud case under the pre-*McNally* honest services framework would circumvent Congressional intent to revive only the "honest services" cases and not election fraud cases. Moreover, obvious problems inhere in any attempt to recast this election fraud case as involving a deprivation of honest services.

---

[7]*See* Anti-Drug Abuse Act of 1988, H.R. 5210, 100th Cong. (1988).

[8]*See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7603, 102 Stat. 4181 (1988).

[9]*See* Anti-Corruption Act of 1989, S. 327, 101st Cong. (1989).

[10]Finally, we also note that the Department of Justice itself decided after the passage of § 1346 that prosecuting election fraud under the honest services doctrine was no longer viable. *See* U.S. DOJ, *Federal Prosecution of Election Offenses* (6th ed. 1995), 1270 PLI/Corp 1019, 1072 ("[W]hile the mail fraud statute can once again be used to prosecute such things as corruption by public servants and embezzlement by campaign officials, it does not reach schemes to deprive citizens of fair elections because such schemes do not include an intent to deprive any identifiable victim of the 'honest services' of a fiduciary."). Moreover, although the government departed from this position in this case, it conceded that the honest services theory was inapplicable to "schemes to deprive citizens of fair elections" in another recent case. *See United States v. Ratcliff*, 381 F. Supp. 2d 537, 543 n.32 (M.D. La. 2005).

This circuit's pre-*McNally* honest services precedents, as examined in *Frost*, require the finding of a fiduciary duty owed by the defendant to the victim.[11]  *See* 125 F.3d at 365-66 (analyzing *United States v. Gray*, 790 F.2d 1290 (6th Cir. 1986), *rev'd McNally*, 483 U.S. 350;[12] *United States v. Runnels*, 833 F.2d 1183 (6th Cir. 1987) ("*Runnels I*"); *United States v. Runnels*, 877 F.2d 481 (6th Cir. 1989) (en banc) ("*Runnels II*")).  In order to determine whether a defendant who did not hold a public office nevertheless owed the public a fiduciary duty, the district court should have applied the "two time-tested measures of fiduciary status" as adopted in *Gray* and reaffirmed in *Frost*.  *See Frost*, 125 F.3d at 366.  This analysis includes: "(1) a reliance test, under which one may be a fiduciary when others rely upon him because of a special relationship in the government, and (2) a de facto control test, under which a person who in fact makes governmental decisions may be held to be a governmental fiduciary."  *Gray*, 790 F.2d at 1296 (quoting *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir. 1982)).  Hays and Newsome, as mere candidates, cannot satisfy these tests.  Taking the de facto control test first, there was no allegation that Hays or Newsome (in his role as candidate) controlled any governmental decisions.[13]  Similarly, in terms of reliance, because by definition candidates do not yet control governmental decisions, the public does not rely upon them.  *See Margiotta*, 688 F.2d at 122.  Finding a fiduciary duty owed by candidates under these facts would require finding that all job applicants owe a fiduciary duty to their potential employers.  In short, applying pre-*McNally* controlling precedent, we hold that Hays and Newsome, as candidates, did not owe the public a fiduciary duty.

Instead of applying the framework of *Gray*, the district court decided that candidates for public office were fiduciaries of the public for two reasons: first, there is some likelihood that election fraud will turn into public corruption once the candidate obtains office; and second, Kentucky has enacted a host of laws to regulate state elections.  We find neither basis for finding a fiduciary duty persuasive.  The potential for a subsequent breach of an actual fiduciary duty once a candidate takes office cannot create a fiduciary duty before a candidate is even elected.  Aside from the speculative nature of this proposition, it ignores the fact that honest services fraud is "anchored upon the defendant's misuse of his public office for personal profit."  *Gray*, 790 F.2d at 1295.  With regard to Kentucky's regulation of elections, individual conduct regulation does not transform the individual into a fiduciary.  Each citizen is subject to a host of statutory requirements, but that does not make the individual a fiduciary.  Neither rationale offered by the district court demonstrates that mere candidates owe the public fiduciary duties.

The district court also reasoned that *Frost* "suggests that the 'intangible right of citizens to fair and honest government' is included in the definition of the 'intangible right of honest services.'"  According to the district court, the "right to fair and honest elections" is axiomatically included in the "right to fair and honest government."  Thus, putting the two together, it follows that honest elections are protected by *Frost*.  We disagree with this reasoning on both levels.  *Frost*'s reference to a right to "fair and honest government" quotes a passage from *Runnels I* that reviewed the history

---

[11]In *Frost*, this court analyzed the propriety of an indictment and conviction of two professors for depriving the University of Tennessee of their "honest services."  *Id.* at 363.  Specifically, the professors were found to have used the mails in furtherance of a plan to aid students in fraudulently obtaining degrees from the university in exchange for the student's causing federal agencies to award the professors government contracts.  On appeal, defendants argued "that § 1346 failed to express any clear [Congressional] intent to override the holding in *McNally* and protect intangible rights to honest services under the mail fraud statute."  *Id.* at 364.  This court rejected that argument, finding that the "timing and the explicit terms of § 1346 make clear that Congress intended the provision to reinstate the doctrine of intangible rights to honest services."  *Id.*

[12]Although *McNally* reversed *Gray*, *Gray* nevertheless reflects our interpretation of the intangible right of honest services before *McNally*, which § 1346 reinstated.

[13]Although Newsome was an incumbent during the campaign in question, both the court's decision to allow the case to proceed and the jury's verdict rested solely on Newsome's role as a candidate.

of the intangible rights doctrine before *McNally*. *See Runnels I*, 833 F.2d at 1185-86. We are not persuaded that *Frost* or *Runnels I* suggested that the right to fair and honest government is necessarily included in the right to honest services as that term is used in § 1346. The additional inference that, assuming there is a right to fair and honest government, the right to honest elections is included therein is also unwarranted. Ultimately, this line of reasoning invites generalization beyond the terms of § 1346.

Because § 1346 evinces Congressional intent to revive only prosecutions for deprivations of the right to honest services, not honest elections, it would contradict such intent to try to recharacterize an election fraud case as a pre-*McNally* honest services case. Moreover, to attempt to do so quickly highlights why the right to honest services and the right to an honest election constituted distinct intangible rights in the first instance: candidates for office do not owe the public a legally cognizable fiduciary duty. For these reasons, the district court should have dismissed the charges in the indictment that were based on the honest services theory of mail fraud.[14]

B.

Our decision that the conduct alleged in the indictment cannot be prosecuted under an honest services theory does not end our inquiry into the district court's application of the mail fraud statute to Turner's conduct. Turner was also indicted and convicted on the theory that he participated in a scheme to fraudulently obtain money or property – specifically, the salary of the elected positions sought by Hays and Newsome.

The salary theory of mail fraud originated as an effort to limit the effects of *McNally*. Because *McNally* did not question the use of the mail fraud statute generally to prosecute frauds devised to obtain money or property,[15] in his dissent, Justice Stevens suggested that some deprivations of intangible rights could be recharacterized as deprivations of money or property:

> [P]rosecutions of corrupt officials who use the mails to further their schemes may continue [in the wake of *McNally*] since it will frequently be possible to prove some loss of money or property. . . . When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer–who is not getting what he paid for. Additionally, [i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal. This duty may fulfill the Court's "money or property" requirement in most kickback schemes.

483 U.S. at 377 & n.10 (Stevens. J., dissenting) (text and footnote merged) (internal quotation marks and citation omitted). Although Justice Stevens's footnote discusses only fraud by salaried officials

---

[14]We know of no other circuit which has ruled on the issue of whether § 1346 revived the prosecution of election fraud cases under an intangible rights theory. Only one district court appears to have addressed the issue directly. *See United States v. D'Alessio*, 822 F. Supp. 1134, 1148 (D.N.J. 1993). In that case, the court concluded, "In the wake of section 1346, the pre-*McNally* caselaw [involving honest elections] still has persuasive effect." *Id.* In response to the specific argument that a candidate provides no "services" to the victims that he defrauds, the district court held that "it is enough that the defendant place himself in a position of public trust and owe a duty of honesty to the alleged victims of his fraud." *Id.* We give little weight to *D'Alessio* because the decision was issued before *Cleveland* and many of the issues addressed in this case were either not presented or not analyzed by the district court in that case.

[15]Moreover, immediately after the *McNally* decision, the Supreme Court clarified that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (holding that the Wall Street Journal's interest in the confidentiality of its news stories before publication was a cognizable property interest, notwithstanding the intangible nature or the property).

and kickback schemes, the Justice Department apparently believed that this approach extended to election fraud, instructing prosecutors that the salary theory of mail fraud remains a viable option in many cases of state election fraud. *See Federal Prosecution of Election Offenses*, 1270 PLI/Corp at 1072 ("*McNally* does not entirely foreclose use of the mail fraud statute to address election fraud. If a pecuniary interest – such as money or salary – is sought through the scheme, the mail fraud statute still applies.").

Despite these instructions, there have been few federal prosecutions of election fraud cases using the salary theory of mail fraud since *McNally* was decided and very few since the 1980s. The acceptance of the salary theory in election cases has also not been uniform. *Compare United States v. Ratcliff*, 381 F. Supp. 2d 537, 549 (M.D. La. 2005) (rejecting salary theory); *United States v. George*, No. CR86-00123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (rejecting salary theory); *Ingber v. Enzor*, 664 F. Supp. 814, 821-22 (S.D.N.Y. 1987) (rejecting salary theory), *with United States v. Webb*, 689 F. Supp. 703, 707-08 (W.D. Ky. 1988) (accepting salary theory); *United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (accepting salary theory). To our knowledge, no other circuit has ruled on the viability of the salary theory in a case of election fraud.[16]

Before *McNally*, schemes to defraud involving state and local elections were not viewed as "money or property" cases. Instead, analysis of election fraud cases before *McNally* focused on whether the conduct resulted in a deprivation of intangible rights. *See Girdner*, 754 F.2d at 880 (categorizing election fraud as involving "intangible political rights"); *Clapps*, 732 F.2d at 1153 (involving "a scheme to deprive an electoral body of its political rights to fair elections free from dilution from the intentional casting and tabulation of false, fictitious or spurious ballots"); *States*, 488 F.2d 761, 765 (involving "a scheme by the appellants to deceive and defraud the public and the Board of Election Commissioners of certain intangible political and civil rights."). Therefore, with the exception of the two aforementioned district court cases, applying the mail fraud statute to a case of election fraud based on a theory that the candidate attempted to obtain money in the form of a salary would be a novel application of the mail fraud statute.

Turner's position is that a scheme to deprive the public of a fair election, which was prosecuted under an intangible rights theory before *McNally*, cannot be recharacterized as a scheme involving money or property. Turner's primary argument parallels the reasoning of the Eleventh Circuit in *United States v. Goodrich*, 871 F.2d 1011 (11th Cir. 1989). In that case, an indictment issued before *McNally* charged the defendant with defrauding the citizens of their right to the honest, faithful, and disinterested services of some county commissioners in connection with a bribery scheme. *Id.* at 1012. After *McNally* invalidated the government's theory of prosecution based on the intangible right of honest services, a superseding indictment was returned charging the defendant

---

[16]Although the government cites *United States v. Walker*, 97 F.3d 253 (8th Cir. 1996), that case provides no real insight into the questions faced by this court. In *Walker*, the defendant was convicted of election fraud offenses on both an honest services and salary theory of prosecution. *Id.* at 254-55. However, there is no indication that the defendant contested these theories of prosecution in the district court. Moreover, the only relevant question on appeal was whether the jury instructions, which allowed for conviction on mail fraud if the jury agreed unanimously on either the honest services or salary theory, violated the defendant's right to a unanimous jury verdict. *Id.* at 255.

In *Ingber v. Enzor*, the Second Circuit reviewed the district court's decision that a general verdict charging both honest services and salary theory could be used to sustain a conviction on the salary theory alone, in light of the fact that the jury was polled as to the separate questions. 841 F.2d 450, 451-53 (2d Cir. 1988). As the district court had done, the Second Circuit determined that the district court's colloquy with a juror did not amount to a special verdict. *Id.* at 456. The Second Circuit did not address the district judge's alternate holding, *see* 664 F. Supp. at 821-22, that even if the jury had returned a special verdict based on the salary theory, such theory was not applicable to election fraud cases. 841 F.2d at 456. Although one court has reasoned that the Second Circuit's decision in *Ingber* was a tacit approval of the salary theory because the government had the option to retry the case, *see Schermerhorn*, 713 F. Supp. at 90-91, the Second Circuit simply did not address the validity of the salary theory.

with defrauding the citizens of the salaries, emoluments, and services of county commissioners. *Id.* The Eleventh Circuit rejected the government's position, holding that

> the property interest alleged to have been denied the victim here – what the government contends [the] County paid salaries for but did not get – is the "honest and faithful services" of the County Commissioners, an interest *McNally* held to be unprotected by the mail fraud statute. Thus, this "property interest" is indistinguishable from the intangible right to good government described in *McNally* and cannot sustain the mail fraud count.

*Id.* at 1013-14. This reasoning was adopted by two of the three district courts that ultimately rejected the salary theory of prosecution. *See Ratcliff*, 381 F. Supp. 2d at 550 (finding that "the alleged object of the mail fraud, the salary and benefits, is indistinguishable from the intangible right of honest services described in § 1346"); *Ingber*, 664 F. Supp. at 821-22 (rejecting salary theory because "the scheme to get the salary and perquisites of office was essentially the same thing as the scheme to defraud the public of its right to a fair election."). Yet, while persuasive, this rationale is not determinative of the issue. Conduct that may be prosecuted under an intangible rights theory could conceivably also be prosecuted under a money or property theory. In general, a defendant may violate the mail fraud statute in several different ways. *See United States v. Miller*, 471 U.S. 130, 134 (1985). Moreover, a single scheme may involve obtaining money by false and fraudulent representations and also involve depriving another of the right to honest services. *See United States v. Caldwell*, 302 F.3d 399, 408 (5th Cir. 2002); *United States v. Harvard*, 103 F.3d 412, 420 (5th Cir. 1997). Thus, the mere fact that the scheme was alleged to deprive the victim of an intangible right does not categorically preclude a finding that the same scheme was also designed to deprive the victim of a property right.[17]

Turner proffers a second theory, namely, that allowing an election fraud prosecution to proceed under a salary theory would circumvent Congressional intent not to revive election fraud cases when enacting § 1346. We disagree. Although Congress chose not to reincorporate election fraud into § 1346's revival of one of the intangible rights, the enactment of § 1346 cannot be understood to have modified § 1341's traditional prohibition of frauds involving money or property. Therefore, if election fraud was prosecutable under a money or property theory before *McNally*, then such a theory remains viable irrespective of § 1346. Similarly, Turner argues that courts and prosecutors would not have used the "far more controversial" intangible rights approach if a straightforward "money or property" approach was available. This reasoning has numerous problems. First, contrary to Turner's suggestion, there was little "controversial" about intangible rights prosecutions before *McNally*, a decision which reversed every federal circuit to have reached the issue of whether the mail fraud statute protected intangible rights. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 621 (2001) (recognizing that the holding of *McNally* "contradict[ed] the *unanimous* and longstanding interpretation of lower federal courts."). Second, as already discussed, the mere fact that prosecutions of election fraud

---

[17]Related to this argument is Turner's argument that *Cleveland* indicates that election fraud schemes involve only intangible rights. Turner derives this conclusion from the Supreme Court's observation, in the process of reviewing the history of the mail fraud statute, that "federal prosecutors had been using § 1341 [before *McNally*] to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property." 531 U.S. at 18. Just after this statement the Court specifically cited a case involving the "electoral body's right to fair elections." *See id.* at 18 n.2 (citing *Clapps*, 732 F.2d at 1153 ("electoral body's right to fair elections")). Contrary to Turner's view, we understand the phrase "unrelated to money or property" in *Cleveland* to define the nature of the right, as opposed to the nature of the scheme. That the "electoral body's right to fair elections" is unrelated to money or property is not doubted. The relevant question is whether the conduct involved in election fraud may be considered a scheme to deprive the victim of both an intangible right and money or property. *Cleveland*, which analyzed only § 1341, did not address this question. *See Cleveland*, 531 U.S. at 20 ("In this case, there is no assertion that Louisiana's video poker licensing scheme implicates the intangible right of honest services.").

under the intangible rights theory before *McNally* were more common than prosecutions under a money or property theory does not necessarily mean that the prosecutions could not have proceeded under a money or property theory. Third, it is obvious from a practical standpoint that there may be great difficulties in prosecuting an election fraud case under the salary theory, not the least of which is proving that the intent of the fraud was to obtain money. Interestingly, the two district courts that accepted the salary theory in an election fraud setting both explicitly recognized the difficulty of procuring a conviction based on an intent to obtain a salary. *See Webb*, 689 F. Supp. at 708 ("It is now the responsibility of the United States to prove that these defendants intended to acquire this tangible property of the Commonwealth of Kentucky. If the United States cannot do so, its prosecution will fail."); *Schermerhorn*, 713 F. Supp. at 93 ("Whether the Government can actually prove in this case that the object of the defendant's alleged scheme was to take the salary and monetary benefits that inure with election as a state senator is a matter that will take some work."). In short, there may have been obvious advantages for prosecutors in using an intangible rights theory, thus explaining why there were no pre-*McNally* salary theory prosecutions.

Because Turner's arguments do not provide a fully satisfactory answer to whether his election fraud may be prosecuted under a salary theory, we undertake a closer analysis of the issue. Mail fraud consists of (1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property. *See United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003); *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000).[18] In the context of election fraud, the government and citizens have not been deprived of any money or property because the relevant salary would be paid to someone regardless of the fraud. In such a case, the citizens have simply lost the intangible right to elect the official who will receive the salary. *See George*, 1987 WL 48848, at *2 ("Without regard to the outcome of the election, the County Judge/Executive by statute was to be paid a salary and reimbursed for expenses. Simply put, the citizenry lost no money or property but only the intangible right legally to elect their County Judge/Executive."); *Ingber*, 664 F. Supp. at 821-22 (describing the salary as a "routine and budgeted" expenditure); *see also Goodrich*, 871 F.2d at 1013 ("[T]he indictment does not allege that the purported mail fraud caused the County to incur any expenses over and above the cost of conducting regularly-scheduled commission business."). Of course, the mail fraud statute does not require an actual loss of property because success of the scheme is not an element of the offense. *See United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) ( "[T]he mail and wire fraud statutes do not require proof that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element of either § 1341 or § 1343."); *United States v. Ames Sintering Co.*, 927 F.2d 232, 235 (6th Cir. 1990) ("The government need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property."); *Erwin v. United States*, 242 F.2d 336, 337 (6th Cir. 1957). But if the scheme is successful, its effect must be to deprive the victim of money or property. Successful election frauds have no such effect.

The district court reasoned that, even if the election fraud could not deprive the Commonwealth of any money in the sense that the salary would be paid to some officeholder regardless of the fraud, the citizens had nevertheless been deprived of the benefit of their bargain. Because the essence of fraud is often that the victim obtains something of lesser value than the price

---

[18]Some of our cases define only two elements of mail fraud: (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme. *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (citing *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998)). In such cases, however, we have made clear that a "scheme to defraud" involves a specific intent to deprive the victim of money or property. *See Jamieson*, 427 F.3d at 402; *Daniel*, 329 F.3d at 485-86; *Frost*, 125 F.3d at 354; *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) (citing *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990)). In addition, some cases have separated the element requiring use of the mails in furtherance of the scheme into two distinct elements: use of the mails, and such use in furtherance of the scheme. *See Frost*, 125 F.3d at 354.

paid, the district court reasoned that it is immaterial that the expenditure was already budgeted. *See Webb*, 689 F. Supp. at 707-08; *Schermerhorn*, 713 F. Supp. at 92. The district court presumed that election fraud results in payment of the budgeted salary to a person of lesser integrity and quality than that originally desired. *See Schermerhorn*, 713 F. Supp. at 92 ("Should it be proven that defendant engaged in the fraudulent [election] scheme here alleged, we think a presumption arises that the citizenry could have secured a better state senator."). On appeal, Turner challenges this reasoning and argues that the benefit of the bargain theory of fraud is inapplicable to election fraud because, unless the candidate lies about some required qualification, such as a judicial candidate falsely claiming to be an attorney, the election fraud will typically have no bearing on the quality of service that the candidate is capable of providing.

As a practical matter, we tend to agree with the district court that a dishonest candidate is likely to make a poor public servant. We also agree with those courts that have held that whether an expenditure would have been made in the absence of the fraud does not insulate the fraud from prosecution in all circumstances. *See United States v. Doherty*, 867 F.2d 47, 60 (1st Cir. 1989) ("18 U.S.C. § 1341 forbids schemes to defraud *or* to obtain money by false pretenses; this statutory language suggests no requirement that the scheme must be aimed at money which would not otherwise have gone to someone who honestly obtained the victim's business."). Still, the controlling principle is that the benefit of the bargain theory is not applicable to cases of election fraud because an election is not a bargained for exchange. In the public election context, which is unique, the State has no ability to "control" its expenditure or "select" who gets paid. That right falls to the people. But this right is a political, intangible one. It is not a property right because, just as the State cannot control the expenditure, neither can the people appropriate the would-be salary.

We acknowledge that it is possible that the government might prove an election fraud case in which the defendant's intent was to obtain a salary. Even if that intent exists, however, the salary theory does not fall within the scope of a scheme to obtain money or property. Because the state would not have been deprived of any money by a successful scheme, the object of the scheme was not the salaries of the offices.

An examination of recent Supreme Court caselaw applying the mail fraud statute in other contexts reinforces our conclusion. Taking this approach, it appears that, as a matter of law, a court must analyze whether the object of fraud is sufficiently economic in nature to constitute "property in the hands of the victim." *See Pasquantino v. United States*, 544 U.S. 349, 355 (2005); *Cleveland*, 531 U.S. at 15. Applying that framework to this case, there can be no dispute that an official's salary is "money or property" in the literal sense. As the Eighth Circuit has said, "Money is money, and '*money*' is specifically mentioned in the statutory words." *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990). It is clear, however, that the Commonwealth has no control over the appropriation of the salary beyond ensuring payment to the duly elected official. The salary is appropriated by operation of law based on the outcome of the election. Although the salary comes from the public fisc, there is no discretion regarding either whether or to whom it is paid. Like issuance of a video poker license in *Cleveland*, Kentucky's "core concern" in the payment of the salary is "regulatory" or, perhaps more aptly in this context, administrative. *Cleveland*, 531 U.S. at 20. As such, Kentucky's interest in the official's salary "surely implicates the Government's role as sovereign, not as property holder." *Id.* at 23-24. The payment of an elected official's salary is not a proprietary act because Kentucky has no right to appropriate, transfer, or otherwise spend the money in question; thus, there is no resulting property deprivation. Nor do the citizens have any property right over the salary. The citizens have a right to cast their vote in a fair and honest election. However, this is an intangible right. Thus, an elected official's salary does not constitute property in the hands of the victim.

Finally, we note that election fraud is fundamentally different from fraudulent conduct designed to secure public employment or promotion through means other than an election, such as

an employment application or promotional exam.  *See Granberry*, 908 F.2d at 279-80 (holding that a defendant who obtained a job as a school bus driver by fraudulently concealing on his job application that he had been convicted of murder deprived the school district of money); *Doherty*, 867 F.2d at 54-57 (holding fraud in a police promotion examination process was a scheme to obtain an additional salary).  The *Granberry* defendant argued that the school district was not deprived of any property because it would have been out just as much money if he had been truthful and that the school district in fact got the competent school bus driver for which it paid.  908 F.2d at 280. Likewise, the *Doherty* defendants argued that their scheme to cheat on the exams was not a scheme to deprive the Commonwealth of money or property because the police department would have paid the salary to some candidate anyway and the government had not shown that the defendants failed to deliver the services for which they were paid.  867 F.2d at 60.  The Eighth Circuit reasoned that what the school district "wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got."  *Granberry*, 908 F.2d at 280.  The First Circuit, in an opinion written by Judge Stephen Breyer, then a member of that court, similarly reasoned that the Commonwealth was deprived of its money because it was deprived of control over how its money was spent.  *Doherty*, 867 F.2d at 60.  We think these examples, which address the government's role as employer, where job qualifications can be economically quantified, are not analogous to an election fraud case, where the government's role is purely administrative and the public's role is a political one.[19]

C.

We stress that our interpretation of §§ 1341 and 1346 is guided by the requirement that Congress speak clearly when enacting criminal statutes and, to an even greater degree, when altering the federal-state balance in the prosecutions of crimes.  In general, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Rewis v. United States*, 401 U.S. 808, 812 (1971).  "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."  *McNally*, 483 U.S. 359-60; *see also D & W Food Centers, Inc. v. Block*, 786 F.2d 751, 758 (6th Cir. 1986) ("No principle of law is better established than the necessity of the criminal law speaking clearly."). Applying this rule when interpreting the mail fraud statute "is especially appropriate . . . because . . . mail fraud is a predicate offense under RICO and the money laundering statute."  *Cleveland*, 531 U.S. at 25 (internal citations omitted).  Moreover, the requirement that Congress speak in clear and definite terms is amplified where, as here, the federal law in question applies to conduct traditionally regulated by state law.  "'[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes."  *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)).  A unanimous Court in *Cleveland* reasoned:

> We resist the Government's reading of § 1341 as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress. Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities.

---

[19]The district court reasoned that, if the scheme occurred as alleged, neither candidate could have obtained the salary of elected office without falsifying the reports to the Registry.  Under Kentucky law, the election of a candidate who knowingly violates Kentucky's campaign finance laws will be voided following a judicial determination of guilt in an action commenced by the government, another candidate, or an individual voter.  *See* Ky. Rev. Stat. § 121.990(4). The fact that Kentucky law permits judicial voiding of an election result buttresses rather than undermines our conclusion that the payment of the salary to the victor is a non-discretionary act.  Unlike an employer who might simply fire an employee who lied on a job application, the Commonwealth cannot unilaterally refuse to pay the salary of a fraudulently elected candidate.

531 U.S. at 24.

We have found no "clear statement" from Congress that either §§ 1341 or 1346 meant to proscribe the use of the mails in furtherance of state election fraud. Congress must therefore speak more clearly than it has if it wishes to do more. *Id.* at 20 (citing *McNally*, 483 U.S. at 360).

## III.

For the foregoing reasons, we vacate Turner's conviction in case 05-6339 and dismiss the indictment in 05-6339. We remand case 05-6326, the perjury case, so that the district court can resentence in that case, if necessary in view of this opinion.